**Michael Su CHIA, Petitioner–Appellant,**

v.

**Steven CAMBRA, Jr., Warden; Attorney General of the State of California, Respondents–Appellees.**

No. 99–56361.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 2000.

Filed March 4, 2004.

James Dirks, Sacramento, CA, for the petitioner-appellant.

Valerie A. Baker, Deputy Attorney General, State of California, Los Angeles, CA, for the respondents-appellees.

Before: D.W. NELSON, BRUNETTI and KOZINSKI, Circuit Judges.

D.W. NELSON, Senior Circuit Judge.

In 1988, two agents of the Drug Enforcement Administration ("DEA") were brutally murdered while executing an undercover sting operation in Monterey Park, California. Michael Su Chia ("Chia") was convicted in California Superior Court of being an accomplice to the murders and participating in a conspiracy to ambush, rob, and kill the agents. Chia, however, claimed repeatedly that, far from being a co-conspirator, he tried to talk one of the shooters, his good friend William Wei Wang ("Wang"), out of the plot. Wang confirmed to local and federal authorities that Chia had nothing to do with the conspiracy. The trial court, however, excluded these statements from being heard by the jury. Federal law as determined by the Supreme Court is clear that due process requires that the "minimum essentials of a fair trial" include a "fair opportunity to defend against the State's accusations" and the right "to be heard in [one's] defense." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). The trial court's decision to exclude reliable material evidence of Chia's innocence therefore constitutes an objectively unreasonable application of clearly established federal law. *See Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). We reverse the district court's denial of Chia's petition for writ of habeas corpus and remand with instructions to grant the writ.

## I. *Factual and Procedural Background*

### A. *The DEA Sting Operation*

On the evening of February 4, 1988, DEA Agent Nadine Takeshta staked out the apartment of Frank Kow ("Kow"), a suspected drug dealer. At 10:10 p.m., Chia's black Mitsubishi was observed pulling up in front of Kow's apartment complex. Chia and his friend, Wang, got out of the Mitsubishi. Wang removed a handgun from the rear of the Mitsubishi and walked into the apartment complex. A

few minutes later, Chia went up the complex stairs, paced on the landing, and then stood at the top of the stairs for several minutes until Wang came out. Wang and Chia walked back to the Mitsubishi together and drove away. Later that night, Wang and Chia were seen together at a local night club.

The next day, Kow called Paul Seema ("Seema"), an undercover DEA agent who was posing as an interested buyer, to schedule a meeting at 11:00 a.m. at Tiny Naylor's, a local restaurant. That same morning, DEA agents again observed Chia's black Mitsubishi at Kow's apartment, first at 10:30 a.m. and a second time at 11:30 a.m. Shortly after 11:30 a.m., other DEA agents observed the same Mitsubishi enter the parking lot of Tiny Naylor's, where the rendezvous between Kow and the undercover DEA agents was scheduled to take place. In the restaurant's parking lot, Chia was seen standing outside his Mitsubishi talking to Wang and another gentleman, Mike Chen ("Chen"). After speaking with Wang and Chen, Chia entered the restaurant. A few minutes later he reemerged from the restaurant, got back in his car, and was observed driving toward the restaurant's front entrance, where he conversed briefly with Kow before driving into a nearby alley. After a brief time, he again returned to Tiny Naylor's parking lot, parked for a few minutes, and then drove out again, before reentering the same parking lot a third time.

Meanwhile, three DEA agents posing as drug dealers, Seema, Jose Martinez ("Martinez"), and George Montoya ("Montoya"), got into a Volvo in the restaurant parking lot with Kow and drove off. The agents carried a bag containing $80,000 in cash with which to consummate the sting buy from Kow. Not knowing that the three "drug dealers" were actually DEA agents,

Kow planned to rob them of the cash rather than sell them drugs. Kow's partners in the plot, Chen and Wang, followed behind in a red Nissan. After driving a short distance, Kow directed the agents to pull the Volvo over to the side of the road. Kow exited the Volvo, stood beside the car, and pointed a gun at the agents. The agents raised their hands. Chen and Wang, in the Nissan, pulled up behind the stopped Volvo. Wang got out of the Nissan, drew his gun, and joined Kow standing next to the Volvo with the three agents still inside. Chen remained behind the wheel of the Nissan, ready to make a quick getaway. After the agents handed the money to Wang and Kow, they opened fire on the agents. Agents Seema and Montoya were killed, and Agent Martinez was seriously wounded.

Kow and Wang fled in the Nissan with Chen behind the wheel. Other DEA agents who were in the area rushed to pursue the suspects. Kow fired on the pursuing agents from inside his Nissan. The agents rammed the Nissan with another vehicle and opened fire on the occupants of the disabled car. In the ensuing melee, Kow and Chen were killed, and Wang was seriously wounded. Shortly after the shootout, Chia was arrested nearby in his Mitsubishi. Three sets of handcuffs, three ski masks, and .45 caliber ammunition were discovered in his car. A local gun merchant testified that several weeks before the shootout Chia had entered his shop with a companion and that the companion had purchased .45 caliber ammunition.

### B. *The Hearsay Statements*

Having survived the car chase and shootout, Wang made four separate statements to the authorities.

Wang's first statement (the "First Statement") was made to DEA agents while he

was still severely wounded. Bleeding from nine gunshot wounds, Wang spoke with the agents while he was being wheeled into surgery in a hospital emergency room. The DEA agents took pains to ensure that Wang understood that he could die while in surgery. The agents believed that in case he did not survive surgery Wang's statements would be admissible as a dying declaration. Wang admitted that he, Chen, and Kow had planned to rob the "drug dealers," who they did not know were DEA agents. Wang also told the agents that nobody other than himself, Kow, and Chen were involved in the actual shooting of the murdered agents. Wang further admitted to shooting one of the agents three times with a revolver and providing the others with a .45 caliber semi-automatic pistol.

Later that same afternoon, while recovering from surgery, Wang made his second statement (the "Second Statement") to a Pasadena police officer. Wang admitted that he had planned to rob the "drug dealers" in conjunction with Kow and Chen. Wang said that he shot two of the agents and provided details about the staging of the robbery, including how Chen was to follow the Volvo in his red Nissan.

Wang's third statement (the "Third Statement") was made to Pasadena police officers later that same evening. The interview was tape-recorded, and the entire tape was admitted into evidence as a prosecution exhibit and played for the jury at Wang's trial. During this interview, police officers asked Wang about Chia's involvement in the conspiracy. Wang had not previously mentioned Chia but explained that Chia told him not to go through with the plan. When pressed by the police, Wang reiterated that Chia was not involved in the plot and that he, along with Chen and Kow, had never intended to split any of the drugs or money that was stolen

from the agents with Chia. In fact, Wang explained that Chia warned him that he should not participate in the plan because Chen and Kow could not be trusted. The police, not Wang, returned to the subject of Chia's involvement. Wang repeated a third time that Chia was not involved in the conspiracy, although he knew about it. Wang said that Chia had dropped him off at Kow's apartment and was only present later because he was concerned about Wang's safety.

Wang's fourth and final statement (the "Fourth Statement") was given to agents of the Federal Bureau of Investigation ("FBI") two days after the shooting. Wang confessed that not only did he plan to rob the agents but that he knew in advance that Kow planned to murder them. Wang stated again that Chia told him not to go through with the plot. He also stated that when he spoke with Chia in the restaurant parking lot, he had told Chia to go home, but Chia remained because he was concerned that Wang could get hurt. In response to questions from the FBI, Wang said that the handcuffs found in Chia's car belonged to an individual named Johnny Lee and that he did not know anything about the ski masks.

Wang's statements to the FBI were consistent not only with his prior statements to law enforcement officers, but also with the independent observations of the DEA agents at the scene of the crime. Wang accurately described Chia taking him to Kow's apartment, where Wang delivered a pistol and ammunition to Kow and learned of the final plans for the robbery. He also accurately recounted that he went with Chia to a nightclub that evening, stayed over with him at a friend's house, and was dropped off by Chia at Kow's apartment the next morning.

At Chia's trial, the trial court excluded Wang's statements from being entered

into evidence: Because the other two alleged members of the conspiracy—Kow and Chen—were killed by DEA agents in the Monterey Park shootout, the only other witness who could testify about Chia's non-involvement in the conspiracy was Wang. Wang, however, invoked his rights under the Fifth Amendment and refused to testify at Chia's trial. When Chia sought to introduce evidence of Wang's statements in his defense, the trial court excluded them as inadmissible hearsay.

The jury found Chia guilty, and the court sentenced him to two terms of imprisonment of twenty-five years to life for the two murder counts, nine years for attempted murder, and two years for possessing a firearm while committing the offenses. After exhausting his appeals before the California state courts, Chia sought federal habeas relief. The district court denied the petition. On appeal, we reversed the district court and granted the petition in a published opinion, *Chia v. Cambra*, 281 F.3d 1032 (9th Cir.2002), holding that the trial court's exclusion of Wang's exculpatory statements amounted to a violation of Chia's due process rights under the Constitution. California petitioned for certiorari to the Supreme Court. The Supreme Court vacated our grant of Chia's petition and remanded for further consideration in light of *Lockyer v. Andrade*, 538 U.S. 63, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

## II. *Standard of Review*

The district court's denial of a 28 U.S.C. § 2254 habeas petition is reviewed de novo. *Alvarado v. Hill*, 252 F.3d 1066, 1068 (9th Cir.2001). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), a federal habeas court may grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if the state court adjudication resulted in a decision that (1) was contrary to clearly established federal law as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States. *Id.* § 2254(d)(1); *see also Andrade*, 538 U.S. at 71, 123 S.Ct. 1166; *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J.).

In explaining what constitutes an "unreasonable application" of clearly established federal law, the Supreme Court held that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75, 123 S.Ct. 1166 (quoting *Williams*, 529 U.S. at 413, 120 S.Ct. 1495 (O'Connor, J.)). An erroneous application of clearly established federal law is not sufficient to grant the petition. *Id.* at 75–76, 123 S.Ct. 1166. Rather, in order for the writ to issue, the state court's application of clearly established federal law "must [have been] objectively unreasonable." *Id.* at 76, 123 S.Ct. 1166.

While "[t]he term 'unreasonable' is no doubt difficult to define," the Court has explained that "it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Williams*, 529 U.S. at 410, 120 S.Ct. 1495 (O'Connor, J.). In assessing whether an application of federal law is objectively unreasonable, courts will often have to engage in an intensive fact-bound inquiry highly dependent upon the particular circumstances of a given case. "Although only Supreme Court law is binding on the states, our Circuit precedent remains rele-

vant persuasive authority in determining whether a state court decision is objectively unreasonable." *Himes v. Thompson,* 336 F.3d 848, 853 (9th Cir.2003).

### III. *Chia's Due Process Rights Were Violated*

The key issue before us is whether the trial court's decision to exclude Wang's statements amounts to an objectively unreasonable application of clearly established federal law as determined by the Supreme Court. We hold that it is. Wang's statements were not only reliable, they were material and would have substantially bolstered Chia's claims of innocence.

The principal issue at trial was the underlying nature and motive behind Chia's actions on February 5, 1988—the day the DEA agents were murdered. Chia's close proximity to the scene of the crime and his frequent interaction with Wang, Chen, and Kow led California to suspect that he was a part of the criminal conspiracy to ambush the federal agents. At trial, California called an expert, who opined that Chia's behavior was consistent with that of someone engaging in "counter surveillance" and speculated that he was attempting to thwart law enforcement operations.

Chia, on the other hand, claimed that he was only acting as a concerned friend. He maintains that he is innocent of the charges and that he played no role in the conspiracy to murder the federal agents. His close proximity to the scene of the crime, according to Chia, was necessary to make sure that his friend, Wang, was not harmed by the other members of the conspiracy—Chen and Kow.

### A. *Due Process*

■ It is clearly established federal law, as determined by the Supreme Court, that when a hearsay statement bears persua-sive assurances of trustworthiness and is critical to the defense, the exclusion of that statement may rise to the level of a due process violation. *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038. "The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense." *DePetris v. Kuykendall,* 239 F.3d 1057, 1062 (9th Cir.2001) (citing *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038).

■ "[T]he Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984))." The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038. " 'A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence....'" *Id.* (quoting *In re Oliver,* 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948)).

■ In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion. *Miller v. Stagner,* 757 F.2d 988, 994 (9th Cir.), *amended on other grounds,* 768 F.2d 1090 (9th Cir.1985). In balancing these interests, we must, on the one hand, afford "due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable ... evidence." *Miller,* 757

F.2d at 995. On the other hand, we must stand vigilant guard over the principle that "[t]he right to present a defense is fundamental" in our system of constitutional jurisprudence. *Perry v. Rushen,* 713 F.2d 1447, 1450–51 (9th Cir.1983) (noting that "[b]ecause this right is so important, language from some cases and commentary suggests that the defendant's right carries conclusive weight, and that the exclusion of *any* relevant evidence is unconstitutional" (emphasis in original)). In light of these competing interests, federal habeas courts must "determine what weight the various interests will carry when placed on the scales," *id.* at 1450, and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.

In assessing the interests at issue in this case, we invoke the five-part balancing test formulated in *Miller.* These factors include: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Miller,* 757 F.2d at 994.

**B.** *Wang's Statements Were Reliable and Critical to Chia's Defense*

█ In the present case, the *Miller* factors tip overwhelmingly in Chia's favor. Although we may not reverse a state court decision simply because it is inconsistent with a rule established by the Ninth Circuit, *Van Tran v. Lindsey,* 212 F.3d 1143, 1154 (9th Cir.2000), *rev'd on other grounds, Andrade,* 538 U.S. at 75–77, 123 S.Ct. 1166, application of the *Miller* factors persuades us that Wang's statements were both reliable and crucial to Chia's defense. "State rules [of evidence] are designed not to frustrate justice, but to promote it."

*Perry,* 713 F.2d at 1453. Here, the trial court's decision not only prevented Chia from presenting a full defense, it precluded the jury from hearing material evidence of his innocence.

**1.** *Wang's Third Statement to the Pasadena Police*

█ ▪Of the four statements that Chia sought to introduce at trial, Wang's Third Statement was by far the most reliable and material as to the issue of Chia's role in the conspiracy. Wang informed Pasadena police officers in no uncertain terms that Chia tried to talk him out of participating in the plot to rob the federal agents. Thus, according to Wang, not only did Chia play no role in the conspiracy, he tried to prevent it. Clearly, this admission inculpates Wang by removing all doubt as to his mens rea, while exculpating Chia. Wang discussed the plot with Chia, was warned by him not to go through with it, and despite Chia's efforts to prevent the conspiracy from going forward, Wang decided to go ahead with it anyway.

The probative value of the Third Statement and its importance to Chia's defense cannot be called into serious question. If believed, Wang's statement exonerates Chia. Chia's whereabouts, movements, and actions before and during the commission of the crime are not in dispute. The only issue is whether his behavior was aimed—as California contends—at facilitating and encouraging the crime, or—as Chia claims—at discouraging the conspiracy and protecting Wang from placing himself in further jeopardy. The Third Statement confirms that Chia may be telling the truth; moreover, it constitutes the only substantial piece of collateral evidence that Chia had at his disposal.

Self-inculpatory statements have long been recognized as bearing strong indicia of reliability. *See, e.g., Fed. R. Evid.*

*804(b)(3); Williamson v. United States,* 512 U.S. 594, 599, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) ("[R]easonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true."). This is such a statement. The self-inculpatory nature of Wang's Third Statement to the Pasadena police is convincing evidence of its inherent reliability. The very words uttered by Wang to the Pasadena police exculpate Chia, while simultaneously inculpating himself. The inculpatory force of the Third Statement is obvious, and indeed California conceded at oral argument that the very words, "he told me don't do it," at once inculpate Wang and exculpate Chia.

The third factor of the *Miller* balancing test, whether the evidence is capable of evaluation by the trier of fact, is also satisfied. If the Third Statement was introduced, the jury would have been called upon to weigh the plausibility of California's theory against Wang's statements. Such determinations are well within the province of the fact finder. In our system of criminal justice, it is not uncommon for juries to be called upon to make credibility determinations or to assess the veracity of a declarant's testimony at trial.

The fourth factor, whether the Third Statement is the sole evidence on the issue or merely cumulative, is also satisfied. Wang was the only member of the alleged conspiracy who survived the shootout with the DEA, and Wang refused to testify at Chia's trial. Thus, Chia was left with only Wang's prior statements to support his claim of innocence. The best and only evidence that Chia possessed to substantiate his claims were Wang's statements.

California was allowed to present, through its expert witness, the Government's theory of the case to the jury. Chia should have been afforded a similar opportunity. "We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard." *Crane,* 476 U.S. at 690, 106 S.Ct. 2142. It was unfair for the trial court to permit California to present evidence as to its theory behind Chia's actions, but to deny Chia the same opportunity and right.

The Constitution's guarantee of due process would ring hollow if a criminal defendant such as Chia were prevented from presenting reliable, material evidence of his innocence at trial, when such evidence lies at the heart of his defense. Inherent within the Constitution's promise of due process lies the cardinal principle that no criminal defendant will be deprived of his liberty absent a full and fair opportunity to present evidence in his defense. For the state court to ignore these fundamental principles and exclude Wang's Third Statement from consideration by the jury amounts to an unreasonable application of clearly established federal law.

### 2. Wang's First, Second, and Fourth Statements

■ Wang's First, Second, and Fourth Statements were also sufficiently reliable and relevant to have been admissible at Chia's trial. Their exclusion was objectively unreasonable as a matter of federal law and only serves to enhance our doubt as to the fairness of this trial and the validity of the conviction that resulted from it.

In Wang's Fourth Statement to the FBI, Wang again confirmed that Chia attempted to convince him not to go through with the scheme to kill the DEA agents. Wang, in turn, told Chia to go home. Chia remained, Wang said, to watch out for his safety, not to further the robbery. Furthermore, Wang admitted that he knew in advance that Kow planned to kill the "drug dealers" as well as rob them. With each

re-telling of events Wang recalls more detail (presumably as he recovers from surgery) and the statements become more self-inculpatory. As Wang's statements progressively exonerate Chia, they also destroy any hope Wang might have had for a defense or sentence mitigation based on a lack of knowledge or intent.

 Although Wang's First and Second Statements do not directly exculpate Chia, they do of course inculpate Wang. In these statements, Wang freely describes the planning and execution of the crime, but never mentions Chia as having participated. If true, this testimony would help demonstrate that Chia was never involved in the conspiracy.

Taken as a whole, the statements bear strong indicia of reliability and are crucial to Chia's defense. While the First Statement does not technically meet the definition of a dying declaration, it was given when Wang knew that he was in real danger of imminent death—a traditional indicium of reliability. Similarly, the Second and Fourth Statements were made while the declarant was still recovering from major surgery. Moreover, all the statements were self-inculpatory, also indicating their inherent reliability.

Wang's First, Second, and Fourth Statements, if believed, are evidence of Chia's innocence. Although California's interest in enforcing its hearsay rules "is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact," *Chambers*, 410 U.S. at 298, 93 S.Ct. 1038, the evidence at issue in this case bears strong indicators of trustworthiness, and is easily capable of having been evaluated by the jury.

 The credibility and worth of each assertion made by Wang to the authorities is further enhanced by their consistency with the independent observations of the DEA agents. When a defendant seeks to introduce an out-of-court statement, the corroboration of the contents of that statement with other evidence is a factor weighing in favor of its reliability. *Chambers*, 410 U.S. at 300, 93 S.Ct. 1038. All four of Wang's statements in this case corroborate and are consistent with the DEA's version of events.

California's interest in excluding Wang's statements was minimal, while the importance of the evidence to Chia was immense. Given that the statements were extraordinarily relevant to the ultimate question of Chia's guilt or innocence, under any reasonable analysis of the constitutional principles at issue in this case, Chia should have been allowed to present evidence of Wang's statements for the jury to hear and evaluate. None of the statements was cumulative of other evidence already presented at trial, nor was the jury likely to face any substantial difficulty in assessing the reliability and relevance of the statements.

### C. The State Court's Application of Clearly Established Federal Law was Objectively Unreasonable in this Case

 In the present case, the trial court correctly identified *Chambers* as the governing legal rule but applied it to the facts of this case in an objectively unreasonable manner. *Chambers* held that when a hearsay statement bears "persuasive assurances of trustworthiness" and is critical to the defense, it may not be excluded by a "mechanistic" application of state hearsay rules. *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. The trial court's decision to exclude Wang's statements was without any reasonable basis and, as such, was just the kind of mechanistic application of state hearsay rules that *Chambers* forbids.

■ As to the importance of Wang's statements, the trial court accurately summarized what was at stake for Chia:

> The activity of Mr. Chia, if taken by itself, is subject to two reasonable interpretations: one, that he was simply trying to help out the buddy and the other, of course, knowing full well what his buddy was doing, he was there to assist and to facilitate and to encourage and aid and abet and everything else.

Despite this clear statement of Chia's position, the trial judge decided that Wang's statements were not helpful to the defense. We find this conclusion to be patently unreasonable. Wang stated that Chia told him not to commit the crime and that Chia was not involved in furthering the conspiracy. These statements are clearly helpful to Chia. If believed by the jury, they exonerate him. While they also show that Chia knew of the plot in advance, mere knowledge is not sufficient under California law to sustain a conviction under an accomplice theory. *See People v. Swain*, 12 Cal.4th 593, 49 Cal.Rptr.2d 390, 909 P.2d 994, 997 (1996).

As to the reliability of the statements, the trial court ruled that Wang's statements did not "match the [Cal. Evid.Code] 1230 definition" of reliability.[1] Although the trial court acknowledged that Wang's statements could be admitted against him at his own trial because they were statements against penal interest, the court held that a different rule applied because Wang was not a party to this case. According to the court, Wang's statements, regardless of their self-inculpatory nature,

were not admissible. The trial court observed that while a statement may be "a classic declaration against penal [interest]," it could still lack the reliability "that this particular section requires." The trial judge commented that he did not believe that statements made "while you are in the clutches of the law" fall under § 1230's definition of reliability.

Our analysis, however, shows that Wang's statements bear compelling indicia of reliability. The trial court engaged in a classic example of what *Chambers* prohibits: "[W]here constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038.

The trial court's distrust of post-arrest statements is also misplaced. The United States Supreme Court has succinctly explained circumstances in which post-arrest statements are suspect: " 'Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.' " *Williamson*, 512 U.S. at 601, 114 S.Ct. 2431 (quoting *Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). This rationale applies where a codefendant *inculpates* the defendant in order to *exonerate* himself. Here Wang did just the opposite, exonerating Chia while inculpating himself.

■ The California Court of Appeal made the same error as the trial court

---

1. California Evidence Code § 1230 reads as follows: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

when it concluded that Wang's post-arrest statements were unreliable, citing *People v. Campa,* 36 Cal.3d 870, 206 Cal.Rptr. 114, 686 P.2d 634, 640 (1984). *Campa,* however, identifies post-arrest statements as inherently suspect "where a declarant in police custody seeks to exculpate himself by implicating another suspect." *Id.* In this case, the declarant, Wang, never even tried to exculpate himself. All of the relevant exculpatory statements at issue pertained to Chia, not Wang. Federal habeas relief does not in most circumstances lie for errors of state law. *See Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). We comment on *Campa* only to point out again that the reasoning underlying the California appellate court's suspicion of post-arrest statements obviously does not apply to the facts of this case.

Our decision in *LaGrand v. Stewart,* 133 F.3d 1253 (9th Cir.1998), is also not applicable here. In *LaGrand,* Karl LaGrand's confession included "two separate statements." First, he admitted that he stabbed the victims, and second, he said that Walter LaGrand, a relative of his, did not stab anyone. *Id.* at 1267. We held that the exclusion of Karl's confession in Walter's trial did not violate Walter's due process rights because "a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant admitted under the exception." *Id.* at 1267–68 (citing *Williamson,* 512 U.S. at 599–600, 114 S.Ct. 2431). Here, the key portions of Wang's statements that exculpate Chia are not corollary; they are directly inculpatory of Wang.

Finally, given that the jury heard evidence from California's expert that Chia's observed behavior could be construed as one of criminal "counter surveillance," principles of basic fairness and due process require that Chia be allowed to present material evidence of his innocence such that "the prosecutor's case [may] encounter and 'survive the crucible of meaningful adversarial testing.'" *Crane,* 476 U.S. at 690–91, 106 S.Ct. 2142 (quoting *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). For it is only through such an examination of the Government's evidence that we can ascertain with the requisite degree of precision its worth on the scales of justice. On the record before us, however, we are firmly convinced that such an examination never occurred and, accordingly, a mistake of constitutional proportions was perpetrated against the rights of this defendant.

### D. *Conclusion*

For the foregoing reasons and in light of the standard set out by the Supreme Court in *Andrade,* we conclude that Wang's four statements were both reliable and crucial to Chia's defense. Because the trial court's exclusion of these statements was an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States, we reverse the decision of the district court and remand with instructions to grant the writ of habeas corpus unless California grants Chia a new trial within seventy days of the issuance of this Court's mandate.

**REVERSED and REMANDED.**

BRUNETTI, Circuit Judge, dissenting:

I dissent because Wang's statements do not bear sufficient indicia of reliability, and the California trial court's exclusion of these statements as inadmissible hearsay did not deny Chia his due process rights under *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

Having asserted his Fifth Amendment right against self-incrimination, Wang was unavailable to serve as a witness in Chia's trial. Thus, Chia sought to introduce hearsay statements made by Wang to the police, that were exculpatory in nature, as declarations against penal interest.[1] *See* Cal. Evid.Code § 1230 (West 1999). The trial court determined that Wang's statements did not fall within this hearsay exception, and that the exclusion of the statements did not deprive Chia of his due process rights under *Chambers*. In order to determine whether exclusion of the hearsay statements rendered Chia's trial fundamentally unfair under Sixth and Fourteenth Amendments, we must examine the statements themselves.

Co-conspirator Wang was first interviewed by the police on February 5, 1988 in the hospital emergency room prior to his undergoing surgery. Before receiving Wang's statements, the police informed Wang that he was badly injured and could possibly die from his several gunshot wounds during surgery. Wang stated that on February 1, 1988 he had entered into an agreement with Kow and Chen to steal $60,000 from some drug dealers. Wang admitted to shooting one of the agents and said that he did not know of anyone else involved in the actual shooting other than himself, Kow, and Chen.

A second statement was taken from Wang at 3:30 p.m. on February 5, 1988, after Wang survived the surgery. Wang told a Pasadena police officer that he, Kow, and Chen planned to rob and murder the "drug dealers." He detailed the shooting of the men in the Volvo (e.g. Kow shot Agent Montoya and grabbed the money bag and Wang shot Agents Seema and Martinez) and the attempt by Kow, Chen, and himself to escape in the Nissan. He described their eventual capture. He did not mention Chia at this time.

Due to a malfunction in the tape recorder during the second interview, a third interview was conducted on the evening of February 5, 1988. Wang provided a similar confession to that obtained in the second interview. During the third interview, however, Wang was also asked about the black Mitsubishi seen by the police. Wang explained that the Mitsubishi belonged to his friend Michael Chia. Wang said that he told Chia about the plan, and that Chia warned him against involvement because Chen and Kow might betray him.

The fourth and most detailed statement made by Wang came on February 7, 1988, when Wang was interviewed by an FBI agent. Wang stated that Kow asked him a week before the incident to help him rob and kill the "drug dealers." Wang again said that he told his friend Chia about the plan and that Chia warned him against involvement because Kow and Chen could not be trusted. Chia nevertheless drove Wang in Chia's Mitsubishi to and from Kow's apartment on the night of February 4 so that Wang could deliver a gun and ammunition and to finalize the plans for the robbery/murders. Chia and Wang later went to dinner at the 8000 Club and stayed the night at a friend's house. The next morning, Chia was at Kow's apartment.

---

1. Section 1230 provides:

 Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Chen drove Kow and Wang to Tiny Naylor's. While acting as a look out in the restaurant parking lot, Wang saw Chia in the Mitsubishi driving around the lot. Wang explained that Chia was watching out for him and again told Wang not to do it. Wang told Chia to go home, but Chia stayed to watch out for Wang. Wang then recounted details of the robbery, escape, and capture.

The California Court of Appeal affirmed the trial court's determination that the four statements did not fall within the statement against penal interest provision of Cal. Evid.Code § 1230. Under California law, "a declaration against penal interest [is] admissible under Evidence Code section 1230 only as to those statements which are specifically disserving to the interests of the declarant. No collateral assertions can be permitted." *People v. Garcia,* 115 Cal.App.3d 85, 105, 171 Cal. Rptr. 169 (Cal.Ct.App.1981) (internal citation omitted). The California Court of Appeal found that Chia was not interested in the admission of the portions of Wang's statements which specifically disserved Wang's interests (such as Wang's statements regarding his own involvement in the robbery and shooting of the DEA agents). Rather, Chia sought only to use Wang's collateral assertions that Chia was not involved in the actual shooting and that Chia tried to dissuade Wang from participating in the enterprise at all. Therefore, according to the appeal court, Wang's statements were properly excluded. The California Supreme Court affirmed without comment.

The majority has correctly identified a rule of clearly established federal law which allows hearsay statements against interest to be admitted into evidence when the statements bear "persuasive assurances of trustworthiness" and are crucial to the defense. *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038. Exclusion of such statements may rise to the level of a due process violation. *Id.* Once a clearly established federal law has been identified, we must determine whether the state court's ruling was "contrary to, or involved an unreasonable application of" the established law. *Lockyer v. Andrade,* 538 U.S. 63, 73, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A decision is "contrary to" clearly established federal law if the court "confronts a set of facts that are materially indistinguishable" from a Supreme Court decision, but nonetheless reaches a different result. *Id.* The final part of *Andrade's* second prong is whether the lower court identified the correct governing legal principle, but unreasonably applied it to this case. *Id.* at 75, 123 S.Ct. 1166. The Supreme Court held that the lower court's application of the clearly established law must be "objectively unreasonable," not merely incorrect or erroneous. *Id.*

The majority has concluded that the district court's "decision to exclude reliable material evidence ... constitutes an objectively unreasonable application" of the *Chambers* rule of law. *See* p. 999. I disagree, because neither prong of the *Andrade* test, which would warrant granting Chia's petition for habeas corpus, has been satisfied. It is true that hearsay rules "may not be applied mechanistically to defeat the ends of justice." *Chambers,* 410 U.S. at 302, 93 S.Ct. 1038. However, the facts of this case are not "materially indistinguishable" (*Andrade,* 538 U.S. at 73, 123 S.Ct. 1166) from *Chambers,* and, therefore, the district court's exclusion of Wang's statements was not contrary to the *Chambers* rule of law. Second, the district court's decision to exclude the statements is not an objectively unreasonable application of the *Chambers* rule because Wang's statements lacked sufficient evidence of reliability and were not corroborated.

There are fundamental differences between Wang's hearsay statements and the statements excluded in *Chambers,* and the majority has failed to explain why this case should not be distinguished. Chambers was tried and convicted of the murder of a policeman in Mississippi, although, shortly after the crime, a third-party, Gable McDonald, had confessed to three friends on separate occasions that he killed the officer and he later made a sworn confession to the crime. *Chambers,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297. Chambers' defense centered on showing that McDonald had killed the police officer. *Id.* at 289, 93 S.Ct. 1038. The state court refused to allow Chambers to treat McDonald, called by the defense, as an adverse witness once he repudiated his sworn confession on the stand. *Id.* at 291, 93 S.Ct. 1038. Mississippi's common-law rule prohibits impeaching one's own witness. *Id.* at 295, 93 S.Ct. 1038. The court also rejected Chambers' attempt to introduce the testimony of three witnesses, to whom McDonald had admitted shooting the officer, on the grounds that the proffered testimony was hearsay. *Id.* at 292–93, 93 S.Ct. 1038. Under its antiquated rules of evidence, Mississippi recognized statements against pecuniary interest, but not statements against penal interest, as an exception to the hearsay rule. *Id.* at 299, 93 S.Ct. 1038. Observing that Chambers' defense was "far less persuasive" than it might have been had he been allowed to admit testimony from other sources about McDonald's confessions, the Supreme Court noted that, because McDonald confessed spontaneously to friends shortly after the crime and his statements were corroborated through other evidence (e.g., McDonald's sworn confession; the testimony of an eyewitness to the shooting; the testimony that McDonald was seen with a gun immediately after the shooting; and proof of McDonald's prior ownership of a .22 caliber revolver and subsequent purchase of a new weapon), the hearsay statements "provided considerable assurance of their reliability." *Id.* at 294, 300, 93 S.Ct. 1038. The Court overturned the state trial court's decision, holding that to deny Chambers the opportunity to treat McDonald as an adverse witness after he repudiated his confession on the stand at Chambers' trial and to exclude as hearsay the testimony of McDonald's three friends, to whom he confessed, deprived Chambers of a fair trial guaranteed by due process. *Id.* at 302, 93 S.Ct. 1038.

The state court, by excluding Wang's statements, did not confront "a set of facts that are materially indistinguishable" from *Chambers,* but nonetheless reach a different result. *Andrade,* 538 U.S. at 73, 123 S.Ct. 1166. While both cases involved the exclusion of hearsay statements, the facts of *Chambers* are distinguishable from Chia's case. Of particular importance in *Chambers,* each of McDonald's confessions was made spontaneously to a close acquaintance shortly after the murder had occurred, was corroborated by some other evidence in the case, and was "self-incriminatory and unquestionably against interest," even while tending to exculpate Chambers. *Chambers,* 410 U.S. at 300–01, 93 S.Ct. 1038. Wang's statements were all made to the police during post-arrest interrogation, and only in response to specific questions about the robbery and murders of the DEA agents. Chia did not have corroborating evidence to support Wang's statements. Finally, while McDonald's statements tended to both exculpate himself and exonerate Chambers, Wang's inculpatory statements do not also exculpate Chia. Therefore, the state court did not reach a decision contrary to *Chambers.*

Next, a writ of habeas corpus may be granted "if the state court identifies the

correct governing legal principle ... but unreasonably applies that principle to the facts" of the case before it. *Andrade*, 538 U.S. at 75, 123 S.Ct. 1166. The majority has held that the state court made an objectively unreasonable application of the *Chambers* rule to Chia's case, because Wang's statements were both reliable and material to his defense. However, Wang's statements lacked sufficient reliability to be within the hearsay exception of *Chambers*.

Critical to the outcome in *Chambers* was the Court's determination that despite Mississippi's state evidentiary rules, the hearsay statements involved "were originally made and subsequently offered at trial under circumstances that provided *considerable assurance* of their reliability." *Id.* at 300, 93 S.Ct. 1038 (emphasis added). Wang's four statements were all made to the police during post-arrest interrogation, and only in response to specific questions regarding the black Mitsubishi and Chia's involvement, whereas the declarant in *Chambers* made three independent statements to three different friends. As the state trial court noted, Wang was quite literally caught in the act, and it is not uncommon for someone in Wang's situation to make statements to protect an arguably less culpable confederate, especially when that confederate is a good friend. Thus, Wang's statements lack the element of reliability found in McDonald's spontaneous confessions in *Chambers*.

Furthermore, unlike in *Chambers*, there is no evidence to corroborate Wang's statements regarding Chia's purported lack of involvement, nor could Wang be impeached about these statements since he invoked his Fifth Amendment rights. Indeed, although corroborating evidence is lacking, the record does reveal Chia's own admissible statements to the police whereby he acknowledges an agreement with Wang to act as Wang's bodyguard, as well as a plan for Chia to hide somewhere near Tiny Naylor's restaurant to look out for and come to Wang's aid should Wang give the signal by sticking his arm out of the car.

Finally, while portions of Wang's statements were undoubtedly self-inculpatory, those sections exculpatory to Chia were not against Wang's interest and therefore were not as reliable as the inculpatory parts. In *LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir.1998), we held that the state trial court's exclusion of hearsay statements of a co-defendant as falling outside of Arizona's "statement against penal interest" rule, which is identical to Federal Rule of Evidence 804(b)(3), did not violate the defendant's due process rights. The defendant Karl LaGrand twice confessed to the police that he stabbed the victim, but stated that his co-defendant Walter LaGrand was not present. *Id.* at 1259. Based on Supreme Court precedent, we determined that "[t]he reliability that attends the inculpatory part of ... [the declarant's] confession does not afford any reliability to that part of the statement that merely exculpates [the defendant]." *Id.* at 1268. We further explained that

> [b]ecause the "statements against penal interest" exception to the hearsay rule is premised upon the inherent reliability of statements that tend to incriminate the declarant, federal courts have concluded that a statement that includes both incriminating declarations and corollary declarations that, taken alone, are not inculpatory of the declarant, must be separated and only that portion that is actually incriminating of the declarant admitted under the exception.

*Id.* at 1267–68 (citing *Williamson v. United States*, 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (noting that judges in federal courts must separate the

incriminatory portions of statements from other portions for purposes of ·Rule 804(b)(3) because"[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-selfinculpatory parts"); *Carson v. Peters,* 42 F.3d 384, 386 (7th Cir.1994) ("Portions of inculpatory statements that pose no risk to the declarants are not particularly reliable; they are just garden variety hearsay."); *United States v. Porter,* 881 F.2d 878, 882–883 (10th Cir. 1989) (if a statement exculpatory to the accused is severable from the statement inculpatory to the declarant, each statement must be separately analyzed under Rule 804(b)(3)); *United States v. Lilley,* 581 F.2d 182, 188 (8th Cir.1978) ("To the extent that a statement is not against the declarant's interest, the guaranty of trustworthiness does not exist and that portion of the statement should be excluded.")).

Since we are deciding whether the exclusion of Wang's statements violated Chia's *federal* due process rights, our decision in *LaGrand v. Stewart,* and the cases to which it cites, are particularly helpful on the question of reliability. They imply that excluding the exculpatory portions of a confession do not raise due process concerns because those portions are inherently unreliable. Both the state trial court and California Court of Appeal recognized as much, noting that Chia was only interested in introducing the exculpatory portions of Wang's statements. Indeed, this is not a case where the exculpatory and inculpatory portions are intertwined in a seamless and unseverable confession. A review of the statements reveals that each was made in the course of question-and-answer style police interrogation where the direction of the questions continually and abruptly shifted from one topic to the next. For example, in Wang's third statement, before mentioning Chia's name, he admitted that he shot a DEA agent and

that he and Kow had planned the transaction to rob the "drug ,dealers" from the very beginning. It is both simple and necessary to identify and separate the reliable inculpatory portions of the statement from those that merely exonerate Chia and do not have the same indicia of reliability. Furthermore, even if Chia also sought to admit the self-inculpatory portions, those parts would have been of questionable benefit to Chia. Unlike *Chambers,* where only one person could have shot the police officer, our case deals with accomplice and conspiracy behavior. Wang's confession in no way exonerates anyone else.

The factors set forth in *Miller v. Stagner,* 757 F.2d 988, 994 (9th Cir.1985), upon which the majority relies, do not support Chia's due process claim. Wang's statements are, at best, minimally reliable, and hence their exclusion did not render the trial fundamentally unfair. Because the statements are not sufficiently reliable, and do not fall within the hearsay exception, the are not probative to Chia's case. Chia has pointed to nothing in the record that requires this court to disregard the state court's findings, nor has he demonstrated that Wang's statements were otherwise reliable. Because Wang's statements demonstrate that Chia knew of the plan to rob and murder beforehand, the slight value of Wang's testimony to Chia's defense did not outweigh the state's interest in excluding the evidence. Chia's due process rights were not violated by the exclusion of Wang's. hearsay statements. *See Galindo v. Ylst,* 971 F.2d 1427, 1429 (9th Cir.1992).

Again, this court's role is to decide whether the state trial court's exclusion of Wang's hearsay statements was an *objectively unreasonable application* of clearly established federal law as interpreted by the United States Supreme Court. *Andrade,* 538 U.S. at 75, 123 S.Ct. 1166.

*Andrade* makes clear that an objectively unreasonable application of federal law is different from an *incorrect* or *erroneous* application of federal law. *Id.* (internal citations omitted). The trial court held an evidentiary hearing and heard arguments on the admissibility of the hearsay statements, in which it determined that the statements fell outside of § 1230 of the California Evidence Code for the same reason that exclusion of the statements do not implicate due process concerns under *Chambers*—the exculpatory statements lacked any indicia of reliability. I am not left with a firm conviction that the trial court's decision was not objectively unreasonable.

I would affirm the district court's decision dismissing Chia's petition for habeas corpus.