**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY DUANE MOSES, *Petitioner-Appellant,* v. ALICE PAYNE, *Respondent-Appellee.* | No. 07-35468 D.C. No. CV-06-01105-MJP ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
February 4, 2008—Seattle, Washington

Filed September 15, 2008
Amended January 30, 2009

Before: Raymond C. Fisher, Ronald M. Gould, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Ikuta;
Dissent by Judge Gould

**COUNSEL**

John Henry Browne, Seattle, Washington, for the petitioner-appellant.

Alex A. Kostin, Assistant Attorney General, Olympia, Washington, for the respondent-appellee.

**ORDER**

The opinion and dissent filed September 15, 2008 are hereby amended. A majority of the panel has voted to deny the petition for rehearing; Judge Gould votes to grant the petition for rehearing. The petition for rehearing en banc is still pending, pursuant to General Order 5.4(b). The parties may file new petitions for rehearing and rehearing en banc as to

this amended opinion, in accordance with the Federal Rules of Appellate Procedure.

## OPINION

IKUTA, Circuit Judge:

A Washington state jury convicted Jeffrey Moses of second degree murder for the shooting death of his wife, Jennifer Moses. In this appeal, we consider whether the district court erred in denying Jeffrey Moses's petition for a writ of habeas corpus. Moses contends that his federal constitutional rights were violated by several evidentiary decisions made by the trial court, including the decision to preclude one of Moses's experts from testifying. Moses maintains that he is entitled to habeas relief because the Washington appellate court's decision to affirm his conviction was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We disagree. The Washington appellate court's decision passes muster under the "highly deferential standard for evaluating state-court rulings" in the habeas context. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (internal quotation marks omitted). We have jurisdiction under 28 U.S.C. §§ 1291, 2253, and we affirm.

I

For a summary of the preliminary facts, we rely on the state appellate court's decision[1]:

---

[1]Because this initial statement of facts is drawn from the state appellate court's decision, it is afforded a presumption of correctness that may be rebutted only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002). Moses does not allege that these preliminary facts are erroneous.

In the early morning of September 27, 2002, Moses' mother, who lived in California, called the police to report that her daughter-in-law, Jennifer Moses was dead. The police found Moses on the street outside his house, drinking beer, and carrying his younger son on his back. Moses' other son was asleep in the house. According to Moses, Jennifer shot herself and committed suicide. When the officers attempted to enter the house, he told them it was unnecessary because he had cleaned everything up. Police found Jennifer wrapped in a rug in the garage, along with a pile of bloody towels and sponges. Jennifer had a gunshot wound to her head, blunt force trauma to her lips and a cracked tooth. The .410 gauge derringer used in Jennifer's death was found in the master bedroom. The derringer had been recently cleaned and was loaded with two unspent shells. When questioned, Moses told police Jennifer had been depressed and that she came downstairs that evening with the derringer, knelt down and shot herself in the head while Moses tried to get the gun away from her. Moses said he moved Jennifer's body to the garage to prevent their sons from seeing her. He then backed his truck up to the garage to load her body into it and bury her in the woods, as she had requested. When the truck hit a post, Moses said he abandoned the attempt to move Jennifer's body.

Following this incident, the state charged Moses with first degree murder and unlawful possession of a firearm. The state's theory of the murder charge was that Moses intentionally shot Jennifer Moses during a domestic dispute. In support of this theory, the prosecution introduced testimony from several witnesses.

Among these witnesses was Dr. Richard Harruff, a medical examiner, who testified that Jennifer Moses had died from a

gunshot wound inflicted to the right side of her upper neck, behind the ear. Dr. Harruff explained that Jennifer Moses's wound was a contact wound, that is, a wound indicating that the gun had been in contact with Jennifer Moses's skin when it was fired. Dr. Harruff further testified that the gun was pointed upwards, "at about an 11 o'clock position," when it was fired in the base of Jennifer Moses's head. Dr. Harruff also stated that a toxicology screen performed during Jennifer Moses's autopsy revealed a blood alcohol level of 0.15.

Over defense objections, the court also permitted Dr. Harruff to testify that in his opinion Jennifer Moses's death was a "homicide." When prompted, Dr. Harruff explained that his use of the word "homicide" was a mixed "medical/legal" standard, signifying the "likelihood of another person's responsibility leading to [the] death." According to Dr. Harruff, the principal reason a medical examiner would certify a death as a homicide would be for purposes of the death certificate. Dr. Harruff testified:

> For example, I would classify something [as] homicide if the evidence that I see, based on my experience and my professional responsibility, indicates that this is a death that needs to be looked at for [the] potential of criminal activity. That's my responsibility, and I certify death based on that. I'm of course not in a position, as the jury is, to render a final conclusion as to whether this represents a murder or not.

Dr. Harruff further clarified that his opinion did not bear on the issue of legal intent, and that his conclusion under the "likelihood" standard was not a determination beyond a reasonable doubt.

Dr. Harruff testified that he tried to limit himself to only "objective" and "unambiguous" factors in his cause-of-death analysis, such as the nature and location of the wound. How-

ever, Dr. Harruff acknowledged that he also considered statements in Jennifer Moses's diary.

During cross-examination, the defense elicited testimony from Dr. Harruff that "individuals who have difficulty with drugs and alcohol are probably at a higher risk of suicide than those who are not." Additionally, Dr. Harruff testified that intoxication and access to firearms are both risk factors for suicide.

The government also called Evan Thompson, a ballistics examiner for the Washington State Patrol Crime Laboratory. Like Dr. Harruff, Thompson testified about the ballistics implications of Jennifer Moses's wound. Basing his analysis on the same objective factors considered by Dr. Harruff, Thompson concluded that Jennifer Moses's death was more likely a homicide than either a suicide or an accidental shooting during a struggle over the gun between Moses and Jennifer Moses. Like Dr. Harruff, Thompson concluded that Jennifer Moses's death was likely the result of homicide.

The trial court also allowed testimony concerning a prior incident of domestic violence between Moses and Jennifer Moses that occurred on November 1, 2001, a little over ten months before Jennifer Moses died. This incident resulted in Jennifer Moses going to the hospital along with her children, and several witnesses affiliated with the hospital testified to the events that followed.

Dr. Warren Appleton, the emergency room physician, testified that he interviewed and examined Jennifer Moses in a medical exam room shortly after the November 2001 incident in order to provide treatment, and observed that Jennifer Moses displayed physical signs of fear and anxiety during the examination. In order to assess and understand her level of fear, Dr. Appleton asked Jennifer Moses what had happened. According to Dr. Appleton's testimony, Jennifer Moses stated that Moses assaulted her and broke her jaw.

The hospital social worker, Tamara Muller, testified that she interviewed Jennifer Moses's children while Jennifer Moses was under sedation, and then interviewed Jennifer Moses. One of the children said that he saw Moses kick Jennifer Moses. As a result of this statement, Muller contacted Child Protective Services (CPS). Muller subsequently interviewed Jennifer Moses, who identified Moses as the assailant who broke her jaw. At some point during the interview, Muller told Jennifer Moses that she had contacted CPS.

Muller also gave more general testimony based on her experiences as a domestic violence counselor. Specifically, she testified that she "very seldom" tells victims of domestic violence to leave their abusive situation immediately. The reason, according to Muller, was that "a victim is most likely to be killed . . . when they leave." This testimony pertained to the prosecution's theory that Jennifer Moses was attempting to leave Moses on or around the night she died.

Finally, the court allowed the government to introduce evidence drawn from Jennifer Moses's journals. Jennifer Moses used two journals, one that was handwritten and one that was posted online. The government principally relied on the online journal (rather than the handwritten journal) to establish the abusive relationship between Jennifer Moses and Moses. When the government sought to introduce evidence from the online journal, the defense countered that the trial court should also admit the handwritten journal, which included several statements indicating that Jennifer Moses was suffering from depression and had thoughts of suicide.

The trial court decided to include entries from both journals for the four months prior to Jennifer Moses's death. However, the court did not admit all of the journal entries written during this four-month period. Concluding that there was an "overlap" between the two journals, the trial court decided to exclude some handwritten journal entries for days on which

Jennifer Moses had also posted an online journal entry. The trial court explained its decision as follows:

> The electronic journal, which covers a time, although it overlaps with the written journal, closer to the time of her death, at the beginning has a section in each entry which describes her state of mind that day or mood and some description of how she was feeling. I did find that it was relevant regarding her state of mind. The written journal didn't necessarily have such statements as to her state of mind. And I believe the entire journal is cumbersome and that we do not need the entire journal admitted into evidence.

Moses objected to this decision, arguing that the court was excluding important evidence regarding Jennifer Moses's state of mind and the nature of his relationship with his wife.

After the prosecution rested, the defense put on its case. The defense's theory of the case was that Jennifer Moses had committed suicide. In support of this theory, the defense introduced evidence from several witnesses to show that Jennifer Moses suffered from depression and had thoughts of suicide in the months leading up to September 27, 2002.

The jury heard testimony from four of Jennifer Moses's medical providers on the issue of her mental health. First, the defense called Dr. William Dickinson, a doctor associated with the Valley General Hospital where Jennifer Moses had been treated for substance abuse and depression. Dr. Dickinson testified that Jennifer Moses suffered from major depression, albeit without suicidal thoughts, as of March 2002. Second, the jury heard from Douglas S. Perry, a chemical-dependency professional who also worked for Valley General Hospital. Perry testified to Jennifer Moses's depression, cocaine and alcohol abuse, and suicidal thoughts. Third, the defense called Barbara Alexander, a mental health counselor

who treated Jennifer Moses from January 2002 through March 2002 at the Hall Health Center of the University of Washington. Alexander testified that she diagnosed Jennifer Moses with major depression. Alexander also testified that major depression can be a life-threatening illness and that people who suffer from major depression tend not to improve if they continue to abuse drugs and alcohol. Finally, the defense called Jacquie Griffin, a record custodian for the Virginia Mason Medical Center. Jennifer Moses received treatment at the Virginia Mason center from April 2002 to August 2002. Because Jennifer Moses's treatment provider at Virginia Mason had died by the time of trial, Griffin was called to testify about the treatment provider's notes. Griffin's testimony indicated that Jennifer Moses continued to suffer from depression and abuse alcohol and cocaine during the spring and summer of 2002. The treatment provider's notes also indicated that Jennifer Moses had experienced suicidal thoughts.

The defense then sought to introduce testimony from Dr. Lawrence Wilson, an expert on depression. In a preliminary evidentiary hearing outside the jury's presence, Dr. Wilson explained that he was prepared to testify regarding the nature of Jennifer Moses's depression and substance abuse, the unlikelihood that Jennifer Moses's depression would have resolved itself before the date Jennifer Moses died, and the ability of a person who was severely depressed to appear normal to friends and co-workers. (This latter opinion was relevant insofar as it rebutted the government's lay testimony that Jennifer Moses was not visibly depressed in the final months of her life.) Dr. Wilson was also prepared to testify that several risk factors, such as depression, substance abuse, and access to firearms, heighten the risk of suicide. Additionally, Dr. Wilson was prepared to testify that lay persons do not fully understand the implications of major depression and the connection between these various risk factors and suicide. Dr. Wilson explained to the court that he based his opinions on Jennifer Moses's mental health records, diary, autopsy report,

and interviews with Moses and one of Jennifer Moses's friends. Although Dr. Wilson was not willing to opine that Jennifer Moses committed suicide, he was prepared to testify that Jennifer Moses fell "into a group of people with an extreme number of severe and significant risk factors for suicide" and that "she continued to suffer [from] major depression . . . that continued to the time of her death."

After hearing argument from both sides, the trial court decided to exclude Dr. Wilson's testimony. The court gave several reasons for its conclusion. First, it stated that Dr. Wilson's opinion that persons who suffer from depression, abuse drugs and alcohol, and have access to firearms experience a relatively higher risk of suicide was already within common knowledge of the jury. Second, it concluded that Dr. Wilson's testimony was cumulative in light of the other evidence introduced by the defense establishing that Jennifer Moses was undergoing treatment for substance abuse, suffered from depression, experienced suicidal thoughts, and had a gun in the house. Third, the court concluded that Dr. Wilson's remaining testimony—namely, "that 15 percent of those diagnosed with major depression will take their own life at some point in their life"—was not sufficiently probative to outweigh its prejudicial effects and potential to confuse the jury.

Finally, the defense sought to introduce a photograph of Jennifer Moses's unclothed and emaciated body taken prior to her autopsy in order to show that Jennifer Moses experienced weight loss as a result of an eating disorder. The court ruled the photo inadmissible, concluding that the probative value of the photograph was outweighed by its prejudicial effect on the jury. Moreover, other evidence of Jennifer Moses's weight loss, including testimony and photos, had been provided to the jury.

The jury convicted Moses of second-degree murder.[2] The

---

[2]Moses was also convicted on the unlawful possession of a firearm charge following a bench trial.

trial court then sentenced Moses to 420 months of incarceration. Moses appealed his conviction and sentence to the Washington Court of Appeals. On September 19, 2005, the appellate court affirmed Moses's conviction in a reasoned opinion, but vacated his sentence and remanded for re-sentencing. Moses then appealed his conviction to the Supreme Court of Washington. On May 31, 2006, the Supreme Court of Washington summarily denied Moses's petition for review.

Moses filed his petition for a writ of habeas corpus in federal court on August 11, 2006. On January 9, 2007, the magistrate judge recommended denying Moses's petition, and on April 10, 2007, the district court adopted the magistrate judge's recommendation and denied Moses's habeas petition. Moses timely filed a notice of appeal on May 10, 2007, and on June 8, 2007, the district court granted Moses a certificate of appealability on all issues.

On appeal, Moses contends that the district court erred in denying his habeas petition. Moses maintains that the state court's evidentiary decisions deprived him of rights secured by the Constitution, and that the state appellate court's adjudication of his appeal "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Specifically, Moses claims that: (1) the admission of out-of-court statements made to Dr. Appleton and Tamara Muller violated Moses's Sixth Amendment right to confrontation; (2) the exclusion of Dr. Wilson's testimony, the autopsy photograph of Jennifer Moses's unclothed body, and the select portions of Jennifer Moses's handwritten journal denied Moses his constitutional right to present his defense; and (3) the admission of opinion testimony from Dr. Harruff, Evan Thompson, and Tamara Muller improperly intruded upon the jury's constitutionally mandated role, thereby depriving Moses of a fair trial.

## II

"[W]e review *de novo* the district court's decision to grant or deny a petition for a writ of habeas corpus." *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004). Because Moses filed his habeas petition after April 24, 1996, his petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See id.* at 965. AEDPA establishes a "highly deferential standard for evaluating state-court rulings." *Visciotti*, 537 U.S. at 24 (internal quotation marks omitted). We must deny habeas relief with respect to any claim adjudicated on the merits in a state court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

The "contrary to" and "unreasonable application of" clauses in § 2254(d)(1) are distinct and have separate meanings. *See Lockyer v. Andrade*, 538 U.S. 63, 73-75 (2003). "A state court decision is 'contrary to' clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases *or* if the state court confronts a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court and, nevertheless, arrives at a result different from its precedent." *Lambert*, 393 F.3d at 974. "[U]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (internal quotation marks and alterations omitted). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly

established law must be objectively unreasonable." *Id.* (citations omitted).

"[C]learly established Federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Id.* at 71-72 (internal quotation marks omitted). In a series of recent cases, the Supreme Court has provided additional guidance regarding when its precedent constitutes the "correct governing legal principle," *Andrade*, 538 U.S. at 75, for the case before the state court, and thus is "clearly established federal law" for purposes of § 2254(d)(1).

In *Panetti v. Quarterman*, the Supreme Court determined that a previously established legal principle extended to the facts before the state court, even though the facts were not identical to those of the underlying Supreme Court decision. *See* 127 S.Ct. 2842, 2858 (2007). The Court considered the habeas petition of a death row inmate who challenged his execution on the ground that he was mentally incompetent. *Id.* The petitioner requested a competency hearing that would meet the requirements of *Ford v. Wainwright*, 477 U.S. 399 (1986), but the state court rejected his request. The federal district court denied the petitioner's habeas petition, and the Fifth Circuit affirmed the decision of the district court. The Supreme Court held that Justice Powell's concurring opinion in *Ford* "constitute[d] clearly established law for purposes of § 2254," *Panetti*, 127 S.Ct. at 2856 (internal quotation marks omitted), and that it established the following legal principle: "Once a prisoner seeking a stay of execution has made 'a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness." *Id.* Although Justice Powell did not specify the procedures required by the Constitution, they included certain "basic requirements" of due process. *Id.*

The Court held that the legal principle established by *Ford* was applicable to the situation in *Panetti* even though the facts in that case were not identical to those in *Ford:*

> AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied. Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner.

*Id.* at 2858 (internal quotation marks and citations omitted). The Court concluded that under a reasonable application of the *Ford* standard, the petitioner in *Panetti* was entitled to the procedural protections enunciated in *Ford*. The Court further concluded that the state court had adopted procedures that did not meet this standard. Due to the state court's unreasonable application of *Ford*, the Court held that AEDPA deference was not applicable. *Id.* at 2859.

In *Panetti*, the legal principle established by *Ford* was directly applicable to the habeas petitioner's case, and therefore the state court was bound to apply it, regardless of the difference in factual patterns between *Ford* and *Panetti*. However, in other cases, the Court has instructed that a legal principle established by a Supreme Court decision is not the "correct governing legal principle," *Andrade*, 538 U.S. at 75, for the case before the state court, and thus not clearly established precedent for purposes of § 2254(d)(1), if a court must modify that principle in order to apply it to a case. *See Wright v. Van Patten*, 128 S.Ct. 743, 746-47 (2008); *see also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006). In *Musladin*, a habeas petitioner argued that the conduct of the murder victim's family, who wore buttons with a photo of the victim during the defendant's trial, deprived him of his Sixth Amendment right to a fair trial. The state court rejected this argument. On appeal to this court, we held that the state court unreasonably applied clearly established Supreme Court precedent. *Musladin v. Lamarque*, 427 F.3d 653, 659-60 (9th Cir.

2005), *rev'd by Carey v. Musladin*, 549 U.S. 70 (2006). In reaching this determination, we relied on *Estelle v. Williams*, 425 U.S. 501, 512 (1976), which held that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes," and *Holbrook v. Flynn*, 475 U.S. 560, 571 (1986), which held that the presence of four uniformed state troopers sitting behind the defendants at trial "was not so inherently prejudicial that it denied the defendant a fair trial." We held that these cases clearly established the legal principle that "certain practices attendant to the conduct of a trial can create such an unacceptable risk of impermissible factors coming into play, as to be inherently prejudicial to a criminal defendant," and held that the family members' buttons had created such inherent prejudice. *Musladin,* 427 F.3d at 656 (internal quotation marks omitted).

The Supreme Court rejected our reasoning because "[b]oth *Williams* and *Flynn* dealt with government-sponsored practices," and "the effect on a defendant's fair-trial rights of the spectator conduct to which Musladin objects is an open question in our jurisprudence." *Musladin*, 549 U.S. at 76. As the Court later explained, the "inherent prejudice test [from *Williams* and *Flynn*], which we thus far have applied only in cases involving government-sponsored conduct, did not clearly extend to the conduct of independently acting courtroom spectators." *Van Patten*, 128 S.Ct. at 745 (explaining *Musladin*) (internal citations, alterations, and quotation marks omitted). Accordingly, the Court concluded that the state court's rejection of Musladin's claim "was not contrary to or an unreasonable application of clearly established federal law." *Musladin*, 549 U.S. at 77.

*Van Patten*, the most recent Supreme Court case on this issue, followed the reasoning in *Musladin*. In *Van Patten*, a defendant claimed a violation of his Sixth Amendment right to effective assistance of counsel because his counsel had participated in a plea hearing by conference call, rather than in

person. The state court rejected this argument because the attorney's performance had been neither deficient nor prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984). The Seventh Circuit, however, held that the state court erred in applying *Strickland*, and that it should have instead applied *United States v. Cronic*, 466 U.S. 648 (1984), which established the rule that "a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial" in circumstances where there was only a small "likelihood that any lawyer, even a fully competent one, could provide effective assistance." *Van Patten*, 128 S.Ct. at 746 (internal quotation marks omitted). Because the Seventh Circuit concluded that *Cronic* was applicable instead of *Strickland*, the state court's failure to apply *Cronic* was contrary to clearly established federal law. But the Supreme Court reversed, explaining: "No decision of this Court . . . squarely addresses the issue in this case . . . or clearly establishes that *Cronic* should replace *Strickland* in this novel factual context. Our precedents do not clearly hold that counsel's participation by speaker phone should be treated as a complete denial of counsel, on par with total absence." *Id.* at 746 (internal quotation marks omitted). The Court concluded that "[b]ecause our cases give no clear answer to the question presented, let alone one in Van Patten's favor, it cannot be said that the state court 'unreasonably applied clearly established Federal law.' " *Id.* at 747 (quoting *Musladin*, 549 U.S. at 77) (alterations omitted).

This series of cases tells us that in order to determine whether a state court failed to apply "clearly established Federal law, as determined by the Supreme Court" for purposes of § 2254(d)(1), we must distinguish between situations where a legal principle established by a Supreme Court decision clearly extends to a new factual context (as in *Panetti*) and where it does not (as in *Musladin* and *Van Patten*). When engaging in this line-drawing exercise, we have noted that a state court must apply legal principles established by a Supreme Court decision when the case "falls squarely within" those principles, but not in cases where there is a "structural

difference" between the prior precedent and the case at issue, or when the prior precedent requires "tailoring or modification" to apply to the new situation. *Smith v. Patrick*, 508 F.3d 1256, 1259-60 (9th Cir. 2007). We have acknowledged that this series of Supreme Court cases "underscores that § 2254(d)(1) tightly circumscribes the granting of habeas relief." *Crater v. Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007).

In light of *Musladin*, *Panetti*, and *Van Patten*, we conclude that when a Supreme Court decision does not "squarely address[ ] the issue in th[e] case" or establish a legal principle that "clearly extend[s]" to a new context to the extent required by the Supreme Court in these recent decisions, *Van Patten*, 128 S.Ct. at 746, 745, it cannot be said, under AEDPA, there is "clearly established" Supreme Court precedent addressing the issue before us, and so we must defer to the state court's decision. If the Court's decisions do provide a "controlling legal standard," *Panetti*, 127 S.Ct. at 2858, that is applicable to the claims raised by a habeas petitioner without "tailoring or modification" of the standard, *Patrick*, 508 F.3d at 1260, the question is then whether the application of that standard was objectively unreasonable, even if the facts of the case at issue are not identical to the Supreme Court precedent. *See Panetti*, 127 S.Ct. at 2858. It is from this starting point that we address Moses's petition for habeas relief.

### III

Moses first contends that the admission of out-of-court statements made by Jennifer Moses and her son to Dr. Appleton and Tamara Muller regarding the November 2001 incident of domestic violence violated his Sixth Amendment right to confront the witnesses against him. The state court rejected this claim, holding that the statements made to Dr. Appleton and Tamara Muller were not testimonial under *Crawford v. Washington*, 541 U.S. 36 (2004), and therefore did not implicate the Confrontation Clause.

**[1]** The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford*, the Supreme Court held that the Confrontation Clause gives criminal defendants the right to confront witnesses who make testimonial statements at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity for cross examination. 541 U.S. at 53-54. In contrast, non-testimonial statements do not implicate the Confrontation Clause. *See Whorton v. Bockting*, 127 S.Ct. 1173, 1183 (2007) (explaining *Crawford*).

Although *Crawford* did not offer a precise definition of testimonial evidence, the Court offered various formulations of the core class of testimonial statements, noting that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or a former trial; and to police interrogations." 541 U.S. at 51-52, 68; *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (refining *Crawford*'s analysis of when statements made during a police interrogation are testimonial for purposes of the Sixth Amendment). *Crawford*'s holding regarding the difference between testimonial and non-testimonial out-of-court statements constitutes "clearly established Federal law" under 28 U.S.C. § 2254(d)(1) for purposes of our AEDPA review of the state appellate court's decision. *See Andrade*, 538 U.S. at 71-72.

**[2]** The state court applied *Crawford*, the correct legal rule. Because the court did not arrive at a result different from the result reached by the Supreme Court in an indistinguishable case, we conclude that the state appellate court's decision was not "contrary to" clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1). *See Andrade*, 538 U.S. at 73. Nor did the state appellate court's adjudication of Moses's Confrontation Clause claim involve an "unreasonable application of" *Crawford*.[3] 28 U.S.C. § 2254(d)(1). In considering

---

[3]The government maintains that we should decide this question by holding that Moses forfeited his Confrontation Clause rights by killing Jennifer

Dr. Appleton's testimony regarding Jennifer Moses's out-of-court statements, the state appellate court correctly noted that although *Crawford* did not provide a "precise articulation" or comprehensive definition of testimony, it did provide the appropriate legal framework for analyzing whether statements were testimonial. Applying state-law precedents interpreting *Crawford*, the state appellate court concluded that Jennifer Moses's statements to Dr. Appleton were non-testimonial because they were made for purposes of diagnosis and treatment, rather than to inculpate Moses. We conclude this is not an unreasonable application of the legal principle established by *Crawford*.

The state appellate court next determined that Jennifer Moses's statements to Tamara Muller for purposes of treatment were not testimonial under *Crawford* until Muller informed Jennifer Moses that she had contacted the CPS. The court concluded that because Muller's statement notified Jennifer Moses of possible legal consequences to her discussion of the domestic violence incident, Jennifer Moses's subsequent remarks were testimonial and the trial court erred in admitting them. Nonetheless, the state appellate court concluded that this error was harmless beyond a reasonable doubt under *Chapman v. California*, 386 U.S. 18 (1967), because of other, untainted evidence identifying Moses as the assailant in the November 2001 assault.

**[3]** Assuming (without deciding) that the state appellate court was correct in concluding that the trial court committed constitutional error in admitting Jennifer Moses's statements after Muller informed her that CPS had been contacted, we must consider whether such constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637

---

Moses and thus making her unavailable to testify at trial. We need not reach this argument, as we deny the petition on other grounds.

(1993) (internal quotation marks omitted); *see also Fry v. Pliler*, 127 S.Ct. 2321, 2328 (2007). We conclude that there was no such substantial and injurious effect. There was over-whelming evidence that Moses caused Jennifer Moses's injuries during the November 2001 incident, including the testimony of Dr. Appleton and the testimony of Brian Green, Jennifer Moses's stepfather, who read into evidence a statement handwritten by Moses admitting to the assault. Therefore, because any constitutional error involved in admitting Muller's testimony lacked the requisite "prejudicial impact," habeas relief is unavailable to Moses for this claim. *Fry*, 127 S.Ct. at 2327.

**[4]** Finally, the state appellate court considered the admission of Jennifer Moses's son's out-of-court statements to Muller. These statements were introduced at trial when the prosecutor asked Muller why she had contacted CPS. Muller explained that because Jennifer Moses's son had told her that his father had kicked his mother, Muller had a mandatory duty under state law to notify CPS. The state appellate court concluded that the government did not introduce this testimony to prove the truth of the matter asserted (whether Moses kicked Jennifer Moses), but rather to explain a separate relevant issue: why Muller contacted the CPS. In *Crawford*, the Court noted that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Therefore, the state appellate court's analysis is consistent with *Crawford* and does not meet the criteria for habeas relief under 28 U.S.C. § 2254(d)(1).

IV

Moses next maintains that he is entitled to habeas relief because the trial court denied him the opportunity to present evidence on his own behalf. In particular, Moses points to the trial court's decisions to exclude: (1) Dr. Wilson's testimony;

(2) portions of Jennifer Moses's handwritten journal; and (3) Jennifer Moses's autopsy photograph.[4]

## A

**[5]** The state appellate court upheld the trial court's decision to exclude Dr. Wilson's testimony because it was cumulative and because the non-cumulative portion of his proposed testimony was not sufficiently probative to outweigh its likely prejudicial and confusing effects on the jury. This analysis was undertaken under the governing Washington evidentiary rule, Rule 702, which admits expert testimony "if it will assist the trier of fact to understand the evidence or a fact in issue." *State v. Farr-Lenzini*, 970 P.2d 313, 318 (Wash. Ct. App. 1999) (internal quotation marks omitted) (explaining that Rule 702 requires that (1) the witness be qualified as an expert and (2) the testimony be helpful to the trier of fact).[5]

---

[4]Moses also contends that the trial court's evidentiary rulings, when analyzed cumulatively, favored the government because they excluded more defense evidence than prosecution evidence. He argues these rulings deprived him of his due process right to rebut arguments presented by the state and therefore deprived him of his right to a fair trial. Even if Moses had exhausted this issue, he has not explained how the state appellate court's rejection of these constitutional claims would be "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Most of the cases Moses cites in support of his argument are inapposite because they pertain to the unique context of capital sentencing proceedings. *See Simmons v. South Carolina*, 512 U.S. 154 (1994); *Skipper v. South Carolina*, 476 U.S. 1 (1986); *Gardner v. Florida*, 430 U.S. 349 (1977). The remaining case, *Ake v. Oklahoma*, 470 U.S. 68 (1985), is not applicable because it concerns a question not raised in this case, "whether the Constitution requires that an indigent defendant have access to the psychiatric examination and assistance necessary to prepare an effective defense based on his mental condition, when his sanity at the time of the offense is seriously in question." *Id.* at 70.

[5]Rule 702 of the Washington Rules of Evidence states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Under Rule 702, expert testimony is helpful to the jury if it concerns matters beyond the common knowledge of the average layperson and is not misleading. *See id.* at 319.

Moses asserts that the state appellate court's decision is contrary to the Supreme Court's precedents holding that defendants have a constitutional right to present relevant evidence in their own defense. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.") (internal quotation marks omitted). The Supreme Court has indicated that a defendant's right to present a defense stems both from the right to due process provided by the Fourteenth Amendment, *see Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), and from the right "to have compulsory process for obtaining witnesses in his favor" provided by the Sixth Amendment, *see Washington v. Texas*, 388 U.S. 14, 23 (1967) (explaining that the right to compulsory process would be meaningless if the defendant lacked the right to use the witnesses whose presence he compelled).

**[6]** However, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," such as evidentiary and procedural rules. *United States v. Scheffer*, 523 U.S. 303, 308 (1998). In fact, "state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," *id.*, and the Supreme Court has indicated its approval of "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury," *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). Evidentiary rules do not violate a defendant's constitutional rights unless they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id*. at 324 (alteration in original) (internal quotation marks omitted); *see also Scheffer*, 523 U.S. at 315 (explaining that

the exclusion of evidence pursuant to a state evidentiary rule is unconstitutional only where it "significantly undermined fundamental elements of the accused's defense"). In general, it has taken "unusually compelling circumstances . . . to outweigh the strong state interest in administration of its trials." *Perry v. Rushen*, 713 F.2d 1447, 1452 (9th Cir. 1983).

The Supreme Court has explained these principles in cases where defendants have argued that state evidentiary rules, by their own terms, impinge upon their constitutional right to present a complete defense. Thus, in *Holmes*, the Court concluded that a defendant's constitutional rights were violated by an evidentiary rule that prevented the defendant from presenting evidence that a third party had committed the crime if the judge determined that the prosecutor's case was strong. 547 U.S. at 328-31. The Court determined that this evidentiary rule did not "rationally serve" the goal of "excluding evidence that has only a very weak logical connection to the central issues." *Id*. at 330. In *Rock v. Arkansas*, 483 U.S. 44, 61 (1987), the Court reached the same conclusion about an evidentiary rule that limited the defendant's testimony to matters she remembered before her memory had been hypnotically refreshed because it was "an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections." Finally, in *Washington v. Texas*, the Court rejected an evidentiary rule that precluded an alleged accomplice of the defendant from testifying on the defendant's behalf (though he could testify for the government) because it could not "even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury." 388 U.S. at 22; *see also Crane*, 476 U.S. at 690-92 (identifying a constitutional violation where a state evidentiary rule precluded a defendant from introducing any evidence relating to the unreliability of his own confession); *Chambers*, 410 U.S. at 302 (concluding that a defendant's fair trial rights were violated when the combined effect of two state rules of evidence precluded him from effectively impeaching a witness whom

he alleged was the actual culprit). On the other hand, the Supreme Court has upheld an evidentiary rule that excluded polygraph evidence in military trials because it did not "implicate any significant interest of the accused" and because it "serve[d] several legitimate interests in the criminal trial process." *Scheffer*, 523 U.S. at 309, 316-17.

**[7]** The Supreme Court has not squarely addressed the question whether Rule 702, the rule of evidence relied upon by the state appellate court in this case, or an analogous evidentiary rule requiring a trial court to balance factors and exercise its discretion, "infring[es] upon a weighty interest of the accused" and is "arbitrary or disproportionate to the purposes [it is] designed to serve." *Scheffer*, 523 U.S. at 308 (internal quotation marks omitted). Rather, as a "well-established rule[ ] of evidence" that permits a court to exercise its discretion in admitting expert testimony when relevant, Rule 702 is more analogous to those evidentiary rules described with approval in *Holmes*. *See* 547 U.S. at 326 ("While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.").

**[8]** Indeed, Rule 702 is different in kind from the rules in *Washington*, *Crane*, *Chambers*, *Rock*, and *Holmes*. The evidentiary rules in those cases, by their terms, required the trial court to exclude crucial evidence that had a critical effect on the trial, with little or no rational justification. In general, the rules precluded a defendant from testifying, excluded testimony from key percipient witnesses, or excluded the introduction of all evidence relating to a crucial defense. In contrast, Rule 702 does not require a trial court to exclude evidence. Rather, it authorizes a court to admit expert testimony "if it will assist the trier of fact to understand the evi-

dence or a fact in issue." *Farr-Lenzi*, 970 P.2d at 318 (internal quotation marks omitted). Accordingly, a decision that Rule 702 itself is constitutional would be consistent with Supreme Court precedent.

**[9]** Because Moses could not successfully argue that Rule 702 by its terms infringed his constitutional right to present a complete defense, Moses's argument is best interpreted as challenging the trial court's exercise of discretion in this case to exclude expert testimony. As noted above, the Supreme Court's cases have focused only on whether an evidentiary rule, by its own terms, violated a defendant's right to present evidence. These cases do not squarely address whether a court's exercise of discretion to exclude expert testimony violates a criminal defendant's constitutional right to present relevant evidence. *See Van Patten*, 128 S.Ct. at 746. Nor do they clearly establish "a controlling legal standard" for evaluating discretionary decisions to exclude the kind of evidence at issue here. *See Panetti*, 127 S.Ct. at 2858. Therefore, the state appellate court's determination that the trial court's exercise of discretion to exclude expert testimony under Rule 702 did not violate Moses's constitutional rights cannot be contrary to or an unreasonable application of clearly established Supreme Court precedent. *See Van Patten*, 128 S.Ct. at 746-47; *Panetti*, 127 S.Ct. at 2858; *Musladin*, 549 U.S. at 76; *cf. Patrick*, 508 F.3d at 1260.

**[10]** Although the Supreme Court has not addressed this issue, several of our prior decisions considered whether a trial court's discretionary determination to exclude evidence violated a defendant's constitutional rights. In *Perry v. Rushen*, 713 F.2d 1447, 1450 (9th Cir. 1983), we derived a balancing test to determine when a trial court's exercise of discretion to exclude evidence under an otherwise valid evidentiary rule might violate a defendant's rights. We refined this test in *Miller v. Stagner*, 757 F.2d 988 (9th Cir. 1985), *amended on other grounds*, 768 F.2d 1090 (9th Cir. 1985), and held that,

In a habeas proceeding, determining whether the exclusion of evidence in the trial court violated petitioner's due process rights involves a balancing test. In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider [1] the probative value of the evidence on the central issue; [2] its reliability; [3] whether it is capable of evaluation by the trier of fact; [4] whether it is the sole evidence on the issue or merely cumulative; and [5] whether it constitutes a major part of the attempted defense.

*Id.* at 994; *accord Chia v. Cambra*, 360 F.3d 997, 1003-04 (9th Cir. 2004); *Alcala v. Woodford*, 334 F.3d 862, 877 (9th Cir. 2003).

The dissent relies on this balancing test as part of its AEDPA analysis of the state appellate court's decision to affirm the exclusion of Dr. Wilson's testimony. *See* dis. op. at 1120-21. For purposes of AEDPA analysis, however,

[T]he *only* definitive source of clearly established federal law under AEDPA is the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied.

*Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003) (internal citations omitted); *see also Crater*, 491 F.3d at 1126 ("[Section] 2254(d)(1) renders decisions by lower courts non-dispositive for habeas appeals."); *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir. 2004). Nor can we conclude that *Miller* merely "illuminates the application of clearly established fed-

eral law as determined by the United States Supreme Court." *Crater*, 491 F.3d at 1126 n.8. Unlike *Washington* and its progeny, *Miller* is not concerned with the question whether a given rule of evidence, by its own terms, impinges on defendants' constitutional rights; rather, the *Miller* balancing test evaluates whether the trial court used its discretion to unconstitutionally apply an otherwise valid rule. Thus, because the *Miller* balancing test is a creation of circuit law, rather than a Supreme Court holding, we cannot fault the state appellate court for not employing it, so long as the state's ultimate disposition of Moses's appeal is not contrary to or an unreasonable application of the Supreme Court precedent that *Miller* interpreted. *See Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004).

The dissent concludes otherwise, noting that we have applied the *Miller* balancing test in the context of AEDPA review. *See Chia,* 360 F.3d at 1003-04. We did so, however, before the Supreme Court provided further clarification of the bounds of an appellate court's AEDPA analysis in *Musladin, Panetti* and *Van Patten*. As discussed above, these precedents clarified that in the absence of a Supreme Court decision that "squarely addresses the issue" in the case before the state court, *Van Patten*, 128 S.Ct. at 746, or establishes an applicable general principle that "clearly extends" to the case before us to the extent required by the Supreme Court in its recent decisions, *Van Patten*, 128 S.Ct. at 745; *see also Panetti*, 127 S.Ct. at 2858; *Musladin*, 549 U.S. at 76, we cannot conclude that a state court's adjudication of that issue resulted in a decision contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Van Patten*, 128 S.Ct. at 747. By necessity, *Van Patten* and *Musladin* impose limits on the relevance of circuit precedent; they are "clearly irreconcilable," *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003), with the conclusion that circuit law may be used to fill "open question[s]" in the Supreme Court's holdings for purposes of AEDPA analysis. *Musladin*, 549 U.S. at 76; *see also Crater*, 491 F.3d at 1126 & n.8 (explaining that, in *Musladin*,

the Supreme Court "discussed and accepted" the principle that § 2254(d)(1) imposes "limits on the relevance of circuit precedent").

**[11]** Because the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here, AEDPA does not permit us to rely on our balancing test to conclude that a state trial court's exclusion of evidence under Rule 702 violated clearly established Supreme Court precedent. Therefore, we cannot agree with the dissent's argument that *Miller* is applicable here.

### B

**[12]** Moses next contends that he is entitled to habeas relief because the trial court excluded some portions of Jennifer Moses's handwritten diary. The trial court admitted medical provider testimony and documentary evidence establishing that Jennifer Moses suffered from depression and experienced suicidal thoughts before her death. The trial court also admitted multiple journal entries indicating that Jennifer Moses was depressed and contemplated suicide. The state appellate court concluded that the trial court abused its discretion in excluding certain handwritten journal entries, but that any error involved was harmless. In light of the evidence admitted by the trial court, even assuming that the trial court's exclusion of evidence was a constitutional error, we agree that it did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotation marks omitted).

### C

**[13]** Moses also maintains that the state appellate court's affirmance of the trial court's decision to exclude Jennifer Moses's autopsy photograph was contrary to Supreme Court precedent. We disagree. The state appellate court noted that

the autopsy photograph was cumulative because the trial court had already admitted other photographs showing Jennifer Moses's emaciated body and because multiple witnesses had testified that Jennifer Moses had lost weight in the months prior to her death. The state appellate court concluded that the photograph was properly excluded because it was cumulative and because its probative value was outweighed by its likely prejudicial effects on the jury. This decision was not contrary to, or an unreasonable application of, controlling Supreme Court precedent, *see Scheffer*, 523 U.S. at 308, and it therefore does not provide the basis for granting Moses' habeas petition under our deferential AEDPA standard of review.

V

Finally, Moses urges this court to grant the writ because the trial court's decision to admit the opinion testimony of Dr. Harruff, Evan Thompson, and Tamara Muller violated Moses's constitutional rights.[6] In support of this claim, Moses relies on Supreme Court decisions establishing that it is the sole province of the jury to determine questions of credibility and to weigh the evidence adduced at trial. *See Goldman v. United States*, 245 U.S. 474, 477 (1918); *see also United States v. Young*, 470 U.S. 1, 18-19 (1985) (prosecutor erred by expressing a personal view that the defendant was guilty).

[14] These cases do not support Moses's contention that the opinion testimony of Dr. Harruff, Evan Thompson, and Tamara Muller improperly intruded upon the province of the jury and thereby deprived Moses of a fair trial. Neither of these cases, nor any other that we have found, supports the general proposition that the Constitution is violated by the

---

[6]We disagree with the state's contention that this issue was not properly exhausted. The district court correctly concluded that Moses argued this issue to the state appellate court in a manner sufficient to satisfy the requirements of AEDPA's exhaustion doctrine. *See Davis v. Silva*, 511 F.3d 1005, 1008-09 (9th Cir. 2008).

admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact. Accordingly, under AEDPA, we must reject Moses's claims to the contrary. *See* 28 U.S.C. § 2254(d); *Van Patten*, 128 S.Ct. at 746-47; *Panetti*, 127 S.Ct. at 2858; *Musladin*, 549 U.S. at 76.

**[15]** That the Supreme Court has not announced such a holding is not surprising, since it is "well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal quotation marks omitted) (alterations in original). Although "[a] witness is not permitted to give a direct opinion about the defendant's guilt or innocence . . . . an expert may otherwise testify regarding even an ultimate issue to be resolved by the trier of fact." *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990); *see also* Fed. R. Evid. 704(a).

Here, Dr. Harruff testified to his opinion as a medical examiner that Jennifer Moses died as a result of a homicide. Dr. Harruff did not testify that Moses murdered Jennifer Moses. Similarly, Thompson did not testify on the ultimate issue; rather, he testified that he classified the death as a homicide based on his expertise as a ballistics expert and his assessment of Jennifer Moses's wound. Finally, Muller testified that, in her experience, victims of domestic violence are most likely to be killed when they attempt to leave their domestic situation. Like Dr. Harruff and Thompson, Muller did not express an opinion as to whether Moses murdered Jennifer Moses. Thus, our own precedent ratifies the state court's decision to admit the testimony of Dr. Harruff, Thompson, and Muller. *See Lockett*, 919 F.2d at 590.

**[16]** Ultimately, however, for purposes of our AEDPA review, it suffices to determine that the constitutionality of such testimony is "an open question in [the Supreme Court's] jurisprudence." *Musladin*, 549 U.S. at 76. We conclude that the state appellate court's decision to affirm the trial court's

decision to admit the opinion testimony of Dr. Harruff, Thompson, and Muller was not contrary to or an unreasonable application of Supreme Court precedent.

## VI

In sum, AEDPA's "highly deferential standard for evaluating state-court rulings" directs the conclusion that Moses's habeas petition must be denied. *Visciotti*, 537 U.S. at 24 (internal quotation marks omitted). The Supreme Court's cases do not squarely address any of the three issues Moses identifies in support of his petition for the writ, nor do any of the legal principles established in the cases identified by Moses "clearly extend" to the facts of this case. *Van Patten*, 128 S.Ct. at 745. AEDPA tethers our habeas review to Supreme Court holdings alone. *See* 28 U.S.C. § 2254(d); *see also Crater*, 491 F.3d at 1126 & n.8. Because the state appellate court's disposition of Moses's appeal was not contrary to or an unreasonable application of apposite Supreme Court precedent, we cannot grant the writ.

Where the state appellate court itself identified constitutional error, we conclude that the identified error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (internal quotation marks omitted); *see also Fry*, 127 S.Ct. at 2328.

**PETITION DENIED.**

---

GOULD, Circuit Judge, dissenting:

On September 27, 2002, Jeffrey Moses's wife, Jennifer, tragically died of a gunshot wound to her head. When police responded to a 911 call from Moses's mother, Moses claimed that Jennifer had committed suicide. Moses said that Jennifer had been depressed and had come downstairs with a gun,

knelt down, and shot herself in the head while Moses tried to take the gun away from her. Moses was tried by jury for premeditated, first degree murder of his wife, and for unlawful possession of a firearm. At Moses's trial the prosecution argued that Moses had intentionally shot his wife in the back of the head, while Moses countered that Jennifer had committed suicide because of severe depression and drug and alcohol abuse, and that his attempt that night to stop her had failed. Among the prosecution's evidence was testimony from a medical examiner and a ballistics expert who each concluded, after an examination of forensic factors, that Jennifer's wounds were likely not self-inflicted, though the evidence permitted the conclusion that suicide had occurred. The prosecution also presented evidence of a prior incident of domestic violence between Moses and his wife. Moses, by contrast, highlighted evidence of Jennifer's history of major depression, including suicidal ideation, problems with eating disorders and substance abuse. Moses also presented testimony by a friend of Jennifer's stating that Jennifer and the friend had talked on the very night of Jennifer's death and that the discussion encompassed the subject of death.

Thus the case presents in high contrast the question whether Jennifer's death was the consequence of her own suicidal actions, or the result of murderous conduct by Moses. In our system of justice, when a fair trial is held the decision of the jury on such an issue is conclusive. If the defendant had been able to present his defense case fairly, I would have no issue with the jury's decision. But if by evidentiary rulings the deck was stacked against the defendant, we should be concerned and insist on a new trial.

I conclude that a key evidentiary ruling rendered the trial unfair. Moses had sought to introduce testimony from Dr. Lawrence Wilson, an expert on depression who the defense wanted to discuss with the jury Jennifer's recent diagnoses with major depression by three different health care professionals, the general nature of major depression, and the

unlikelihood that the depression would have resolved itself before the date Jennifer died. Dr. Wilson additionally would have testified about the increased likelihood that someone suffering from major depression would commit suicide and about his perception that lay persons do not fully understand the implications of major depression.

The trial court excluded Dr. Wilson's testimony, stating that Dr. Wilson would have offered information of "very little weight," namely, that depressed people are more likely to kill themselves than people not depressed, that access to guns for depressed people is bad, and that drugs, alcohol, financial stress, and marital strife make the problem worse—all of which, the court reasoned, fell within a juror's common knowledge. The trial judge dismissed Wilson's remaining testimonial offerings as being, in sum, that there was a roughly 0.25% higher chance that Jennifer, as an individual diagnosed with major depression, would commit suicide within the six month period between her diagnosis and her death than that a non-depressed person would. The trial judge determined that this information was of minimal probative value, outweighed by its prejudicial effects and potential for jury confusion.

The jury found Moses guilty of second-degree murder and first-degree unlawful possession of a firearm. The Washington Court of Appeals sustained Moses's conviction, and the Washington State Supreme Court denied Moses's petition for review without comment. Having made no progress in the state courts, Moses filed his petition for a writ of habeas corpus in federal court in August of 2006. The district court denied Moses's petition. The district court rejected Moses's argument that the exclusion of Dr. Wilson's testimony had violated his Sixth and Fourteenth Amendment rights, reasoning that the testimony would have been cumulative and of such limited probative value that its exclusion did not deprive Moses of any constitutional rights. On appeal Moses argues that the trial judge's exclusion of Dr. Wilson's testimony

denied Moses his clearly established constitutional right to present a defense. Although the majority affirms the district court's view, I rather think that the total exclusion of testimony of this important defense expert witness was a grave error that should shake our confidence that the jury reached its verdict after a fair trial. Hence I respectfully dissent because I would grant habeas relief and require the state to retry Moses in light of the state trial court's exclusion of Dr. Wilson's testimony.[1]

Moses argues that the trial court's decision to exclude Dr. Wilson's testimony violated his constitutional rights under *Washington v. Texas*, 388 U.S. 14 (1967), and its progeny. Moses is up against a difficult standard. To succeed in his claim, the state court's decision must have been "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). But the Supreme Court has long guaranteed the defendant's right to present his case, and so the extraordinary exclusion in total, as contrasted with a mere limiting of testimony, of a key defense expert witness, in a murder trial where specialized expertise was pertinent, gets Moses inside the door where we should be giving the very closest of attention to his claim. For if he is right, possibly a jury convicted an innocent man of murder. Though we must accept that risk without much pause in a case where a defendant like Moses fully and fairly presented his evidence, we should be much more reluctant to accept the conclusion in a case where the state court kept from the jury all testimony of an important defense expert.

---

[1]Reaching this conclusion, I need not, and do not, address any of Moses's remaining arguments. However, if the exclusion of Wilson's testimony does not in itself require habeas relief, then I believe that a very close look would be required at the question whether the cumulative force of trial court rulings, generally denying much of the helpful evidence proffered by Moses and admitting almost whatever the prosecution tendered, offended due process by depriving Moses of a fair trial. The majority never addresses this question.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in Supreme Court decisions or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision . . . and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). I conclude that exclusion of Dr. Wilson's testimony was not "contrary to" clearly established Supreme Court law, because the state appellate court recognized the general principle required in *Washington* that a defendant has the right to present a defense. It cannot be said that the state court of appeals applied the wrong law contrary to the dictates of Supreme Court precedent. Nor were the facts of Moses's case materially indistinguishable from those of the Supreme Court cases that he invokes. In *Washington*, the trial court had prevented a percipient witness from testifying because of a state statute, which the United States Supreme Court held violated the defendant's Sixth Amendment right to have compulsory process for obtaining witnesses, applicable to the states through the Fourteenth Amendment. *Washington*, 388 U.S. at 23. In *Chambers v. Mississippi*, 410 U.S. 284 (1973), state evidentiary rules—specifically, a "voucher" rule preventing a defendant from cross-examining his own witness and general rules against hearsay—prevented a defendant from presenting one witness who had repudiated a prior confession to the same crime and other witnesses who would have discredited that repudiation. *Id.* at 294. The United States Supreme Court held that exclusion of this critical evidence that directly affected the ascertainment of guilt denied the defendant a fair trial. *Id.* at 302-03. *See also Holmes v. South Carolina*, 547 U.S. 319 (2006) (state evidentiary rule excluding evidence of third-party guilt if prosecution's case was strong violated defendant's right to present a complete defense); *Rock v. Arkansas*, 483 U.S. 44 (1987) (state evidentiary rule excluding post-hypnosis testimony unconstitutionally burdened defendant's right to testify at trial in the absence of clear state evidence that post-hypnosis recollections are invalid).

None of these Supreme Court cases specifically addresses a state court's exclusion of a critical defense expert based on state evidentiary rules concerning the admissibility of expert testimony and a trial court's determination of whether the expert testimony in its view would be helpful to the trier of fact. Accordingly, I conclude that the state court decision was not "contrary to" clearly established Supreme Court precedent.

Our attention must focus on whether the state court decision was an "unreasonable application" of clearly established Supreme Court precedent. A state court decision constitutes an "unreasonable application" if it "correctly identifies the governing legal rule but applies it [objectively] unreasonably to the facts" of the case. *Williams*, 529 U.S. at 407-08, 410-11. Thus "section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a governing legal principle to a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63 (2003); *see also Wilcox v. McGee*, 241 F.3d 1242, 1244 (9th Cir. 2001) ("The Supreme Court need not have addressed a factually identical case; § 2254(d) only requires that the Supreme Court clearly determine the law." (internal quotations, citation, and alteration omitted)). The AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.' . . . [t]he statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007). Our independent review of the legal question must leave us with a "firm conviction" that the state court committed a clear, objectively unreasonable error. *Id*.; *see also Andrade*, 538 U.S. at 74-75.[2]

---

[2]Although section 2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, circuit law may be "persuasive authority" on the question of whether a state court's determination was an unreasonable application of the Supreme Court's precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v. Ducharme,* 200 F.3d 597, 600-01 (9th Cir. 1999).

The *Washington* line of cases from the United States Supreme Court firmly establishes the general proposition that a defendant has a constitutional right to present a defense at trial. The crux here concerns how that principle is to be applied in the context of the state court's decision excluding any testimony from Moses's defense expert whose testimony was proffered on a critical issue in Moses's trial for murder of his wife.

In *Washington* itself, the Court stated: "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies . . . . [A]n accused has the right to . . . present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington*, 388 U.S. at 19.

Since *Washington*, the United States Supreme Court has continually reaffirmed this fundamental right to present a defense. In *Chambers*, the Court proclaimed: "Few rights are more fundamental than that of an accused to present witnesses in his own defense[,]" and stated that it was not establishing any new principles of constitutional law but merely applying established ones to hold that the trial court's rulings deprived the defendant of a fair trial. *Chambers*, 410 U.S. at 302-03. The Court reemphasized the right's centrality to due process of law in *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). More recently in *Holmes*, the Court stated: "[S]tate and federal rule-makers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. This latitude, however, has limits. . . . [T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. This right is abridged by evidence rules that infring[e] upon a weighty interest of the accused and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Holmes*, 547 U.S. at 324-325 (citations and quotations omitted, second alteration in original). *See also*

*Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (holding that "an essential component of procedural fairness is an opportunity to be heard").

The central theme running through each of these Supreme Court cases is the clearly established right that the Constitution guarantees to a criminal defendant to present relevant and material witnesses in his defense. These cases circumscribe the state's ability to infringe that right: a state may limit the defendant's evidence only when that limitation has a nonarbitrary purpose(s) that is (are) proportionate to the corresponding infringement upon the defendant. *See, e.g.*, *Chambers*, 410 U.S. at 295 ("the right to confront and to cross-examine is not absolute . . . . But its denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined." (citations omitted)).[3]

---

[3]The government's citation to *Carey v. Musladin*, 127 S. Ct. 649 (2006), to support its argument that the Washington state court's adjudication was not contrary to or an unreasonable application of clearly established federal law, does not avail it. In *Musladin*, the Supreme Court held that the effect on a defendant's fair-trial rights of courtroom spectator conduct was an open question in its jurisprudence. *Id.* at 653. The Court reasoned that it had clearly established the law in this general area only as to government-sponsored practices, not as to spectator conduct. *Id.* By contrast, in the present case, the Supreme Court has clearly established the applicable law, as outlined above.

Similarly, the majority's reliance on *Wright v. Van Patten*, 128 S.Ct. 743 (2008), is unavailing. In *Van Patten*, the Supreme Court held that its jurisprudence does not clearly hold that counsel's participation in a plea hearing "by speaker phone should be treated as a 'complete denial of counsel' on par with total absence." *Id.* at 746. The Court noted that it had clearly established law regarding the finding of a Sixth Amendment violation without inquiring into counsel's actual performance when "counsel is either totally absent, or prevented from assisting the accused during a critical stage of the proceeding," but not where counsel participates by speaker phone." *Id.* at 746.

Neither of these precedents sufficiently undermines our Circuit law so as to allow the majority to disregard it in light of the standards set in *Mil-*

Here, as the Washington Court of Appeals noted, Dr. Wilson's testimony was excluded under a Washington evidentiary rule governing admissibility of expert testimony, which requires that 1) the witness is qualified as an expert, and 2) the testimony would be helpful to the trier of fact. The state appellate court determined that the trial court did not abuse its discretion in determining that Dr. Wilson's proffer failed the second prong. The court of appeals concluded that Dr. Wilson's testimony added only that Jennifer had a minimally greater chance of committing suicide than a person who had not been diagnosed with major depression during the time period in question, dismissing his remaining proffer as information either that would already be introduced by other witnesses or that was within the average juror's common knowledge.

The state evidentiary rule at issue is of the type that United States Supreme Court precedent has contemplated to be a valid exception to a defendant's general right to present a defense. *See, e.g.*, *Holmes*, 547 U.S. at 326-27 (" . . . [W]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. Plainly referring to rules of this type, we have stated that the Constitution permits judges 'to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " (citations and quotations omitted, ellipsis and second brackets in original)). However, the fact that the exclusion of evidence is grounded in familiar evidentiary rules alone does not determine that such exclusion is

---

*ler v. Gammie*, 335 F.3d 889 (9th Cir. 2003). ("Issues decided by [the Supreme Court] need not be identical in order to be controlling [in the Ninth Circuit]. Rather, [the Supreme Court] 'must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.' ") *Id.* at 900.

constitutionally permissible. It is one thing to limit the scope of testimony, via evidentiary rulings, but it is another thing, and of drastic consequence for Moses, for the state court to have entirely excluded his important defense expert.

In *Chambers*, as discussed above, the Supreme Court considered and invalidated the state's application of its hearsay rules. The Court preliminarily noted, "The hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." *Chambers*, 410 U.S. at 298. Nonetheless, the Court held that its application in that case was unconstitutional: the Court admonished, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*. at 302. The Court overturned the state's application of the hearsay rule in those circumstances, despite the rule's status as perhaps the most "respected [and most] frequently applied [rule of evidence] in jury trials." *Id*. Despite the values served by the hearsay rule, it could not be applied in a way that unreasonably denied the defendant his right to present a defense.

To consider whether the rule permitting Moses to present his defense was unreasonably applied requires placing the exclusion of the defense expert testimony in context. First, it should be recognized that as a general matter the presentation of defense witnesses lies at the heart of the defendant's right to mount a defense. *Washington*, 388 U.S. at 19. Second, in the context of Moses's trial, whether his wife committed suicide was critical. There was no question that she was shot in the head. There was no question that Moses's prints were on the gun. There was no question that Jennifer suffered from major depression and at times had had a suicidal ideation. The issue was whether the jury should believe or reject Moses's story that his suicidal wife was attempting to kill herself when he unsuccessfully intervened trying to stop her from making

the fatal shot. In a sense, we can never know for certain what happened: Did Moses shoot her in cold blood and try to place the blame on her previously expressed suicidal tendencies? Or did she take her own life, ensnaring Moses in culpability because he was there and tried to stop her? In our system of justice, appellate judges must recognize that they can never know for certain what were the underlying facts. Determination of those facts is in the province of the jury. But what we must do is to ensure that the process by which the jury receives the question is a fair one, so that we can have confidence in its determination of criminal guilt beyond a reasonable doubt.

In my view, under the circumstances of Moses's case, application of Washington's expert evidentiary rule unconstitutionally denied Moses his right to present a defense to the jury. To put the key issue a different way, did the state's interest in preventing what the trial judge perceived to be inadmissible testimony under Washington evidentiary rules constitutionally have to make way to Moses's right to have the jury hear Dr. Wilson's testimony? To make such a determination in habeas cases, "we employ a balancing test for determining whether the exclusion of testimony violates due process." *Alcala v. Woodford*, 334 F.3d 862, 884 (9th Cir. 2003) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)).[4] We must "weigh the probative value of the evidence, its reliability, whether the trier of fact can evaluate the evidence, whether the evidence is cumulative, and whether the evidence proves integral to the defense theory" against the state's interest in excluding the evidence in order to evaluate whether it was constitutionally excluded. *Id.* (citing *Miller*, 757 F.2d at 994).

Under this test, I conclude that the trial judge improperly

---

[4]Although *Miller* itself preceded enactment of AEDPA, we have applied its test after AEDPA to determine what Supreme Court precedent requires. *See, e.g.*, *Chia v. Cambra*, 360 F.3d 997, 1003-04 (9th Cir. 2004).

excluded the defense expert's testimony. First, there is no indication that the evidence was not reliable. To the contrary, the trial court excluded the testimony based in part on its assumption that the bulk of Dr. Wilson's testimony was within the average juror's "common knowledge," suggesting that the evidence was in fact not only reliable but plausible. Second, and for similar reasons, Dr. Wilson's proposed testimony was readily within the jury's ability to evaluate. Dr. Wilson would have presented no complicated or technical issues for the jury to navigate but rather a straightforward, expert assessment of, among other things, major depression and suicide generally, the implications of a diagnosis with major depression, and potential inconsistencies between the external appearances and the internal state of a depressed and/or suicidal individual.

As for whether the testimony would have been cumulative, as the Washington appellate court noted, the jury ultimately heard much of the evidence concerning Jennifer's recent treatment history from either the different medical examiners themselves or from an individual from the examiner's records office who read the contents of the medical file to the jury. However, the jury did not hear the testimony Moses hoped to offer through Dr. Wilson concerning: the unlikelihood that Jennifer would have recovered from her major depression by the time of her death; the higher likelihood that individuals diagnosed with major depression, particularly with Jennifer's individual risk factors, have of committing suicide than individuals not so diagnosed; the possibility that a significantly depressed person might successfully mask that depression to his or her acquaintances; and the unlikelihood that those who are not experts fully understand the ramifications and nature of major depression. The jury also did not hear Dr. Wilson's analysis of other evidence of Jennifer's emotional state, such as her journal entries. Thus the jury did hear some of the information that Dr. Wilson's testimony would have encompassed, but it never heard substantial portions; the evidence was only partially cumulative.

A defendant in a murder case has an interest in presenting his defense points and themes through witnesses whose views support the defense theory of the case and whose testimony may be ordered in a way aimed at persuading the jury to a conclusion of doubt. Here, if the state trial court had let the defense expert testify, but had imposed some reasonable limit on scope of his testimony, with the aim of managing trial time and avoiding cumulative testimony, no significant constitutional issue could be presented. But in my view what makes the decision of the state trial court an unreasonable application of Supreme Court precedent is the total exclusion of testimony by a key defense expert witness in a murder case on a critical issue that could likely affect the verdict of the jury. *Cf. Boykins v. Wainwright*, 737 F.2d 1539, 1544-45 (11th Cir. 1984) (noting that fundamental fairness is violated when the evidence excluded is material as being crucial, critical, and a highly significant factor in the defense, and concluding that exclusion of defense witness's testimony concerning defendant's mental health history violated fundamental fairness when defendant's sole defense at trial was insanity).

Although I understand the majority's line of reasoning in analysis, I am left with the conclusion that the expert Dr. Wilson's testimony was critical to Moses's case in the full context presented. Moses had admitted not only to his presence when Jennifer died, but that he was either reaching for the gun or actually had his hand on it when it fired. Moses's trial boiled down to a determination of whether Moses killed Jennifer with the requisite intent or whether Jennifer had committed suicide as Moses tried to stop her. Given this defense theory, Dr. Wilson's testimony was central to the defense's case. It was imperative that the jury fully understand not only Jennifer's history of major depression but also the nature, attending implications, and occasionally-misleading external appearance of major depression and suicidal tendencies generally. Moreover, Moses had an interest in presenting his points of defense through Dr. Wilson who, in a coordinated way, could put together the disparate pieces of the puzzle that

Jennifer's mental health treatment providers, from whom the jury heard portions of Jennifer's medical records, had presented, and give an overview that would be helpful to the jury's understanding.

Dr. Wilson's testimony in my view was of significant probative value. Dr. Wilson's testimony was aimed at providing framework and context to help the jury make sense of the medical and psychological diagnoses that it heard from other witnesses, to assess the plausibility that Jennifer had committed suicide. The trial judge based his dismissal of Dr. Wilson's testimony in large part on his assessment that "depressed people are more likely to kill themselves than people who are not depressed. I think the jury understands that," and a series of corresponding, reductive assessments that "access to guns for people who are depressed is a bad thing . . . . Drug and alcohol use makes the problem worse[,]" and so on. Although the trial court thus reduced much of Dr. Wilson's testimony to being common knowledge, and though the specific statements that the trial judge made are indeed arguably common knowledge, or at least common sense, an analysis of Dr. Wilson's proffered testimony reveals that those simplistic propositions are an unfair characterization of the essence of his testimony. The state trial court would have judged in a more fair procedure if it had let the jury hear the defense's expert evidence and then make its own decision.

First, it is not without significance that one of the most central points of Dr. Wilson's testimony—as a renowned, indisputable expert in the field of psychiatry generally and depression specifically—would have been to elaborate on implications of major depression, including the extent to which the reality of major depression in fact diverges from the layperson's impression. Elaboration on implications of a key illness, and particularly a mental illness, is not in common knowledge of all jurors.

Second, the trial court improperly discarded Dr. Wilson's proffered testimony about studies, concerning the increased

likelihood that a depressed person will commit suicide, that are not within the jury members' common knowledge. In his offer of proof, Dr. Wilson had discussed, among other things, empirical studies indicating that if one follows a group of people who have major depression over their lifetime, about 15% will kill themselves. Both the trial court and the Washington Court of Appeals diminished this testimony to, in essence, an indication that Jennifer had a 0.25% increased chance of committing suicide during the six-month period preceding her death.

There are flaws with this reasoning. First, this statement and the trial judge's comment, stated above, about depressed people being more likely than non-depressed people to commit suicide, both misunderstand the import of Dr. Wilson's testimony: his statement concerns the probability that a depressed person will commit suicide over his/her lifetime, not the extent to which a depressed person is more likely than a non-depressed person to commit suicide. Second, the calculation falsely assumes a linear trajectory that is an inappropriate inference from the statistics Dr. Wilson cites; that the overall percent is 15% does not mean that one can mechanistically divide a depressed person's life expectancy by a particular time frame to determine in any meaningful way the chances of suicide during that time frame. The state trial court missed the broader message: that people with major depression have a significant likelihood of committing suicide at some point in their lives, and correspondingly, that the lives of 15% of individuals with major depression end in suicide (*i.e.*, the statistic derives its import from a focus on the depressed person's death, not the life or its duration). Again, the state trial court would have been on sounder ground to let the jury assess the significance of the expert's testimony, rather than just suggesting it was obvious as well as *de minimis* and excluding it. The issue was not whether a person with major depression is more likely than other individuals to commit suicide but rather the likelihood that a person with major depression is going to commit suicide at all. To assess

that likelihood the jury would have benefitted from hearing Dr. Wilson.

The trial court also excluded Dr. Wilson's testimony on the basis that he could not state, on a more probable than not basis, that Jennifer committed suicide. However, no one who was not a percipient witness could have done so definitively. The case presented very little objective evidence of Jennifer's mental state in the weeks and days immediately preceding her death. Yet this does not render Dr. Wilson's testimony any less essential to the jury's complete picture of Moses's case. Given the dearth of psychological evidence one way or another, Dr. Wilson's testimony about the implications of major depression and the unlikelihood of Jennifer's recovery was pivotal to Moses's case and all the more constitutionally protected.

Moses's only defense was that Jennifer had committed suicide. It was essential that the jury understand major depression in conjunction with Jennifer's history. Exclusion of Dr. Wilson's testimony handicapped Moses's ability to impart such an understanding. Stated another way, the defense did not get a fair shot to present its defense theory through expert testimony.

By contrast, the state's interest in wholly excluding Dr. Wilson's testimony in this instance was minimal. The trial judge noted that the jury would already know that there were firearms in the Moses home and would hear evidence of Jennifer's various recent medical and psychological treatments. The trial court summarized the state's interest, in effect, as follows: "the expert witness testimony . . . would be a waste of time. It poses a risk of confusion for the jury and brings us far too far afield of the issues relevant in this case." However, Moses offered Dr. Wilson's testimony so that the depression expert could testify on issues at the very heart of Moses's trial: the likelihood or plausibility that Jennifer had committed suicide and the likelihood that other individuals—Jennifer's

acquaintances and the jury alike—would misunderstand the appearance and ramifications of a "major depression" diagnosis without the insight his testimony would provide. Dr. Wilson's testimony cannot fairly be characterized either as a waste of time or as "too far afield." Dr. Wilson was indisputably competent to give his views on depression, and it strains imagination to suggest that his views would have been a time waste and not a help to a jury charged with determining the fate of Moses.

Further, contrary to the trial court's suggestion, the subject matter posed no likelihood of confusing the jury. Indeed, the trial court's statement on the one hand that Dr. Wilson's testimony was, in essence, "common knowledge" is at odds with its subsequent statement, on the other hand, that the testimony poses a risk of jury confusion. And any minimal, potential risk for confusion could have been contained by simple, clarifying cross examination. As for the potential for some aspects of Dr. Wilson's testimony to be cumulative of points established by testimony from other witnesses, or from documentary sources, a reasonable solution, in light of the fact that Dr. Wilson's testimony added some additional perspectives about the nature of depression and possibilities of recovering from it, would have been to permit Dr. Wilson's testimony, but to draw reasonable lines or limits on its scope.

The state's interest in excluding Dr. Wilson's testimony was minimal when weighed against Moses's substantial interest in having the jury hear it, given its centrality to his sole theory of defense. Exclusion of the testimony not only inhibited the jury's ability to have a clearer picture of the case before it, but it denied Moses his clearly established constitutional right to present a defense to the jury. Just as the Supreme Court in *Chambers* held that existing constitutional principles determined that the evidence exclusion deprived the defendant of his right to present a defense, here it was an objectively unreasonable application of *Washington* for the

trial court to exclude Dr. Wilson's testimony and for the court of appeals to affirm.

Finally, I cannot say that the exclusion of Dr. Wilson's testimony did not have a "substantial and injurious effect" on the jury's verdict. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Dr. Wilson's testimony was important to the jury's ability fully to assess the ramifications not only of major depression generally but of Jennifer's specific past, including her various diagnoses. Given the centrality of this testimony to Moses's sole theory of defense, I am in "grave doubt" as to the error's effect, and thus cannot deem the error harmless. *See O'Neal v. McAninch*, 513 U.S. 432, 436-37 (1995). The error significantly hampered Moses's ability to present a complete and accurate picture of Jennifer's mental state at the time of death and its implications for her likely cause of death, and I cannot say that it was not likely to have a substantial and injurious effect on the jury verdict.

Even if the majority were right that we should not apply the balancing test of *Miller v. Stagner*, I would not view this case in an "open area" where habeas relief is unwarranted. Even without applying a balancing test, I reach the same conclusion simply by recourse to what the Supreme Court said in *Washington* and its related cases. Our *Miller* case merely shows a rational way to assess considerations that are pertinent under the Supreme Court's precedent. This balancing test does not impose a new standard of circuit-made law upon the states. Here, the presentation of a key defense witness was excluded, and Moses did not get the opportunity to fairly present his defense theory.

I reluctantly conclude that Moses was unduly constricted in presenting his defense which was objectively unreasonable, and thereby did not receive a fair trial. The Supreme Court's *Washington* decision and related cases are ample precedent to give relief. The case presents a question of high concern because if Moses's wife committed suicide, then an innocent

man is in prison. As noted earlier in such a case we can never be absolutely certain of what truly occurred, and in our system of criminal justice we must rest on the jury's decision when it has been fully and fairly advised of the defense's position. Doubtless, the trial court could have limited and circumscribed the scope of testimony from Moses's expert, but to totally preclude that expert witness from testifying is for me a step drastically too far in a murder case where possible suicide was the critical issue and the deceased had a history of severe depression.

The way the majority reads *Musladin* and *Van Patten* would go pretty far in depriving anyone habeas relief who does not have a case identical to one the Supreme Court has already decided. To take that approach reflects an incorrect judgment that may limit the efficacy of habeas relief, an approach particularly ironic in light of the Supreme Court's recent tribute to habeas jurisdiction in *Boumediene v. Bush*, 128 S.Ct. 2229 (2008).

I would therefore reverse the district court's order denying Moses's petition for a writ of habeas corpus, and remand the case with instructions to grant the writ and to order the prisoner released absent retrial within a specified period. Thus, I respectfully dissent.